23 N.J. Super. 419 (1952)
93 A.2d 183
HUDSON COUNTY NEWSPAPER GUILD, LOCAL 42 OF THE AMERICAN NEWSPAPER GUILD C.I.O., ET ALS., PLAINTIFFS-APPELLANTS,
v.
JERSEY PUBLISHING COMPANY, A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 3, 1952.
Decided November 25, 1952.
*420 Before Judges EASTWOOD, GOLDMANN and FRANCIS.
*421 Mr. Raymond Chasan argued the cause for the plaintiffs-appellants.
Mr. Howard Engel argued the cause for the defendant-respondent (Messrs. Lichtenstein & Engel, attorneys).
The opinion of the court was delivered by EASTWOOD, S.J.A.D.
This action is for alleged breach by defendant of a collective bargaining agreement and for the recovery of two weeks' wages because of defendant's failure to give notice of the suspension of its business. The issue was submitted to the Superior Court, Law Division, Hudson County, upon the pleadings and a stipulation of facts in lieu of pretrial and the taking of proofs. The court entered judgment in favor of the defendant, from which judgment the plaintiffs appeal.
The stipulation of facts states: The plaintiff, Hudson County Newspaper Guild, Local 42 of the American Newspaper Guild C.I.O., is an unincorporated labor organization representing former employees of the defendant's editorial department; that defendant published The Jersey Observer continuously for many years until November 17, 1951, when it suspended its publication and terminated its business. As a consequence thereof, all of defendant's employees lost their jobs.
The pertinent provisions of the collective bargaining agreement dated June 15, 1951 and in effect on the date publication was suspended and business ceased, read as follows:
"Article VIII-Severance Pay
1. Upon dismissal, an employee upon request shall receive a written notice from the Publisher or his agents stating the cause for his dismissal.
2. Upon dismissal, an employee shall receive cash severance pay in a lump sum, equal to one week's pay for every twenty-six weeks or major fraction thereof, such pay to be computed at the highest weekly rate of salary received by the employee during his service with the Publisher. The maximum of such dismissal pay shall not exceed an amount equivalent to 30 weeks' pay.
*422 3. Severance pay need not be paid in the event of proven theft, self-provoked discharge for the purpose of collecting severance pay or for dismissal under the maintenance of membership clause.
Article IX-Vacations

* * * * * * * *
3. In the event of termination of employment, an employee shall receive accrued vacation pay.

* * * * * * * *
Article XII-Security
1. There shall be no discharges except for just and sufficient cause. Except in the case of proven dishonesty, or self-provoked discharge for the purpose of collecting severance pay, the Guild shall be notified in writing at least two weeks in advance of any discharge, with the reason for the dismissal stated in such notice.
2. There shall be no discharge as a result of putting this agreement into effect.
3. There shall be no discharge of or other discrimination against any employee because of his membership or activity in the Guild. There shall be no interference or attempt to interfere with the operation of the Guild.
4. There shall be no imposition of unreasonable duties upon any employee."
Following the suspension of publication and the cessation of business operations, the defendant paid to its employees severance and accrued vacation pay provided for in the aforementioned agreement. It was conceded that defendant did not give the Guild any advance notice of its intention to suspend publication and to terminate the employment of its editorial staff. The only notice of its proposed suspension was published in its newspaper November 15, 1951.
The plaintiffs instituted this action claiming that the employees were discharged within the meaning of Article XII of the aforementioned agreement; that the Guild had not been given the required two weeks' advance written notice of the suspension and that they were thereby entitled to recover the equivalent of two weeks salary from the defendant. The defendant, in its answer, denied the necessity, under the circumstances, of giving the Guild the two weeks' notice, asserting that the employees were not entitled to the sums sued for.
*423 The plaintiffs argue that they were "discharged" within the meaning of the collective bargaining agreement; that "discharge" connotes cessation of employment without regard to the reason therefor, save misconduct of the employee; that in labor circles, court decisions and collective bargaining agreements, the concept of a dismissal is broadly equivalent to termination of employment; that, in particular, the cessation of the employer's business, per se, constitutes a "discharge"; that the agreement does not employ the word "layoff"; it makes absolutely no distinction between the words "discharge" and "dismissal" but, on the contrary, employs them interchangeably; that defendant obligated itself to give advance notice of discharge in all cases except misconduct of the employee, and that having failed to give the requisite notice, the individual plaintiffs are entitled to pay equivalent to the length of notice required; and that they are entitled to the favor of any doubts that the trial court entertained concerning the construction of the collective bargaining agreement.
The defendant contends that its failure to give notice to the Guild of its retirement from business and the consequent termination of all employment did not render it liable to the plaintiffs; that the individuals were employed on a week-to-week basis, requiring no notice to terminate their employment; that the agreement did not constitute an employment contract with the individual plaintiffs, guaranteeing employment during its period of effect; that paragraph 1 of Article XII of the agreement is not applicable here; that this clause of the contract relied upon by the plaintiffs must be construed as applying only to individual discharges for alleged fault of the employees while the business continues; that its sole purpose was to afford an opportunity for a hearing on and possible prevention of the discharge; and that the defendant, by payment of severance and accrued vacation benefits, completely discharged its obligation to the employees under the terms of the agreement.
*424 We turn now to a construction of the agreement and the respective use of the word "discharge" in Article XII of the agreement and the word "dismissal" in Article VIII, and the words "termination of employment" as used in Article IX, section 3. In comprehending the situations contemplated by the parties when it comes to the defining and applicability of these words, we think it clearly appears that "dismissal" as used in the agreement indicated a severance by the employer of an employee or employees, for cause as well as for reductions in staff and temporary or permanent layoffs and that "termination of employment" as used in the agreement (Article IX, section 3, entitled "Vacations"), covered all types of severance, including "discharges" and "dismissals" and voluntary severance at the instance of the employee; that "discharge" was used to indicate a severance at the instance of the employer of a particular employee for an alleged fault, misconduct or incompetence. It seems to us that it is quite apparent that the purpose of the notice of intended discharge as incorporated in Article XII was to permit the Guild to investigate whether the reasons stated by the employer in its notice of proposed discharge were substantiated in fact, to prevent unwarranted discharge by allowing the Guild to invoke the grievance procedure provided for under Article XI in an unsubstantiated case.
The nature of a collective bargaining agreement has been passed upon by the United States Supreme Court in the matter of J.I. Case Co. v. National Lab. Rel. Bd., 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762, at p. 766 (1944), wherein it is stated:
"* * * Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. Without pushing the analogy too far, the agreement may be likened to the *425 tariffs established by a carrier, to standard provisions prescribed by supervising authorities for insurance policies, or to utility schedules of rates and rules for service, which do not of themselves establish any relationships but which do govern the terms of the shipper or insurer or customer relationship whenever and with whomever it may be established. Indeed, in some European countries, contrary to American practice, the terms of a collectively negotiated trade agreement are submitted to a government department and if approved become a governmental regulation ruling employment in the unit.
After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. * * *"
Similarly, in Teller on Labor Disputes and Collective Bargaining, sec. 154, p. 476, it is said:
"The collective bargaining agreement is generally not a contract of employment but rather a statement of rights possessed or obligations assumed by the employees for whose benefit or on whose behalf the agreement is made. The agreement supplements the employer-employee relationship, and supplants that relationship only to the extent necessary to carry out the terms of the agreement. * * *." citing J.I. Case Co. v. National Lab. Rel. Bd., supra.
The agreement in question is not a contract of employment between the parties, but merely a set of regulations governing the employment status. There is no guarantee of continued employment, but merely a statement of agreed working conditions and rights and obligations of the respective parties on termination thereof. In construing such an agreement, the rule of construction that applies to all written instruments is controlling here.
In construing contracts and other written agreements, the court must, if possible, ascertain and give effect to the mutual intention of the parties. Fletcher v. Interstate Chemical Co., 94 N.J.L. 332 (Sup. Ct. 1920), affirmed 95 N.J.L. 543 (E. & A. 1921); Basic Iron Ore Co. v. Dahlke, 103 N.J.L. 635 (E. & A. 1927); Moses v. Edward H. Ellis, Inc., 4 N.J. 315 (1950); Washington Construction Co., Inc., v. Spinella, 8 N.J. 212 (1951).
The meaning intended to be conveyed by the terms "dismissal" and "discharge" does not appear to have universal and unvarying acceptance so as to connote a meaning *426 with exactness and not subject to misunderstanding. In some instances they have been used interchangeably without apparent distinction by the user and in others they have been held distinguishable. The definition or meaning to be attributed to the words employed is to be obtained from its use in the particular instrument, from the language of the instrument as a whole, the intent of the parties and the circumstances surrounding its execution.
It is stated in Corn Exchange, &c., Phila., v. Taubel, 113 N.J.L. 605, 610 (E. & A. 1934):
"Where, as here, general or indefinite terms are employed in the agreement, the court may look into the attending circumstances, and avail itself of such light as they may afford in ascertaining the true meaning of the language so used. Basic Iron Ore Co. v. Dahlke, supra; Fletcher v. Interstate Chemical Co., 94 N.J.L. 332; 1 Contracts A.L.I. § 235. In such a situation the court must regard the relation of the parties and the circumstances under which the contract was made, and the objects which the parties were thereby striving to accomplish. Such an inquiry is not for the purpose of changing the writing, but to secure light by which to ascertain its actual significance. Walker v. Brown, 165 U.S. 654, 17 S.Ct. 453, 41 L.Ed. 865. * * *"
And, as stated by Professor Williston in 9 Williston on Contracts (rev. ed.), sec. 46, p. 64:
"* * * Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent. A contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions. Individual clauses and particular words must be considered in connection with the rest of the agreement, and all parts of the writing and every word of it, will, if possible, be given effect. * * *"
In support of their construction of the agreement, that they were entitled to two weeks' notice of the proposed termination of employment by suspension of its business, and the equivalent pay for its failure to give such notice, the plaintiffs place great emphasis upon the cases of In re Public Ledger, 161 F.2d 762, 773 (C.C.A. 3, 1947); Matthews *427 v. Minnesota Tribune Co., 215 Minn. 369, 10 N.W.2d 230, 147 A.L.R. 147 (Sup. Ct. 1943); In re Brooklyn Citizen, 90 N.Y.S.2d 99 (Sup. Ct. 1949); and In re New York Tribune, Inc. and American Newspaper Guild, Newspaper Guild of New York Local 3 (C.I.O.), 8 Labor Arbitration Reports 410 (1947). We do not find these cases apposite. In the Public Ledger case and in the Brooklyn Citizen case, the court was considering the claims of employees under certain union contracts, including those with locals of the American Newspaper Guild, and the relief that was awarded was under a "notice clause" only in the cases of contracts which did not contain severance pay clauses. In the Public Ledger case, the court held that loss of employment caused by the newspaper's bankruptcy was a "discharge" within the meaning of the severance pay clause of the Guild contract. On the other hand, the court held that what had occurred was a "layoff" within a "notice clause" under another union contract in which notice was to be given to the employee rather than to the union. Then again, in the Brooklyn Citizen case the award was made to the Guild members (employees) under a severance pay clause reading "upon termination of employment by dismissal or discharge, an employee shall receive cash severance pay * * *." In the Matthews case, the court, in describing what had occurred, used the word "discharge," but adjudged that a "dismissal" had resulted, and awarded to the newspaper guild members (employees), relief by way of severance pay, it being the relief it sought. In the New York Tribune case, where the dismissals occurred as the result of over-staffing of a department, the issue was not as to whether the dismissals involved constituted "discharges" as within the contract notice clause, and the arbitrator held that the dismissals were not discharges within the meaning of the provision of the contract, that "There shall be no discharges except for good and sufficient cause."
The purpose of a severance pay clause is to tide over a dismissed employee between jobs. In cases where there has *428 been ascribed to a "notice clause" a similar purpose, it appears that the contract considered in such case did not contain a severance pay provision. In re Public Ledger, supra; In re Brooklyn Citizen, supra; In re Matthews, supra. We are inclined to the view that by the provision in the collective bargaining agreement sub judice, for severance pay, it was not intended that the notice provision, Article XII, should perform the function that was performed more adequately by the severance pay provision, whereby the employees were paid an aggregate of $45,656.15 of severance pay and $832.40 of vacation pay was made. The severance pay ranged from a minimum of $374.50 to a maximum of $3,739.50, and the average severance pay was $1,690.
Although determinations of an administrative agency are not binding upon the courts as a judicial precedent, we feel that often they are helpful in ascertaining an accepted meaning "within the trade," of the significance of words or phrases and their use in that field. This view is supported by our Supreme Court, where, in the case of Alnor Construction Co. v. Herchet, 10 N.J. 246, 254 (1952), it stated:
"* * * The standard of interpretation is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the writing, other than oral statements by the parties of what they intended it to mean, except where it produces an ambiguous result, or is excluded by rule of law establishing a definite meaning. This is a primary rule of interpretation which is always applicable, whether the writing seems clear or ambiguous."
In the matter of Hudson Mohair Co. v. United Textile Workers of America, A.F. of L., 11 Labor Arbitration Reports 42 (March 22, 1948), the question of discharge was presented and it was there decided that:
"There is nothing conclusive to be drawn from the fact that an action taken on July 31st, 1947 (when the plant shut down), was called a `discharge.' A mere label has no meaning unless that to which it is applied is generally recognized by the label. The field of *429 industrial relations may be plagued by problems of semantics, but surely the designation of `discharge' is not one of them. There are three recognized components of employment separation: (1) A quit  indicating voluntary separation from a job by employee decision; (2) A layoff, which may be temporary or permanent, and is prompted by a production drop, technological change, or abolition of a job; and (3) A discharge, involving a dismissal from employment for the reason of unsatisfactory performance or behavior as an employee.
The foregoing `labels' have widespread acceptance and usage by persons in the industrial relations field and, more important, by workers in American industry."
In the case of National Lab. Rel. Bd. v. Knoxville Publishing Co., 124 F.2d 875 (C.C.A. 6, 1942), it was held:
"Article XII related to discharges, and provided for two weeks' notice in advance to the Guild of such action in order for its standing committee to consult with the respondent."
The intendment of Article XII of the agreement in question appears to be a negative provision prohibiting the discharge of an employee upon groundless charges of misconduct or incompetence and not a restriction upon the employer's right to decide for itself the question of discontinuing business operations for economic or other reasons.
In Amelotte v. Jacob Dold Packing Co., 173 Misc. 477, 17 N.Y.S.2d 929, 933 (Sup. Ct. 1940), affirmed 260 App. Div. 984, 24 N.Y.S.2d 134 (App. Div. 1940), it was said:
"The limitations placed upon the employer under the contract to discharge an employee for cause without a hearing is not applicable to a situation such as this. Plaintiff's discharge was not for cause in the sense used in the contract but solely by virtue of the right vested in the employer to discontinue his business if and when he saw fit. The exercise of that right does not call upon the employer for explanation, or afford the employee the right to a hearing. His discharge was for reasons other than those prohibited by the contract and defendant's decision to sell out its business does not subject it to an action by its employees foreclosed of employment by the exercise of the prerogative of the employer to continue in business or not at will." See also, Union Drawn Steel Co. v. National Lab. Rel. Bd., 109 F.2d 587 (C.C.A. 3 1940).
*430 So appraised, the integrated agreement here, considered as a whole, evinces an intent to make a general set of rules governing employment and, as pertains to the pertinent provisions quoted above, the consequences of termination of employment. Under the terms of Article VIII thereof, it was provided that severance pay was to be allowed except in the case of self-provoked discharge or dismissal for cause. This was to carry the employee for an interim period after termination of employment in recognition of his length of faithful service. In addition thereto, it was provided under Article IX that accrued vacation pay would be made to the employee on termination of employment. Article X provides for sick leave to be allowed to employees, and Article XI provides for a grievance committee to be designated by the Guild to adjust grievances with the employer. Article XII provides that the employer shall not discharge an employee without sufficient cause and as security to the employee, it is provided that except in cases "of proven dishonesty, or self-provoked discharge for the purpose of collecting severance pay," the Guild shall be given two weeks' advance notice in writing of the contemplated discharge and the reason therefor. As we have already stated, we believe this was to allow sufficient time for the grievance committee to investigate the authenticity of the reasons given for the proposed discharge and to take the necessary steps to protest and prevent an unfounded discharge. To impart any greater significance to this provision would give it a sense of guarantee of employment during the term of that agreement in the nature of an employment contract which clearly was not intended.
The judgment of the Law Division is affirmed.