109 N.J. Super. 555 (1970)
264 A.2d 98
EDWARD B. McKEE AND BARBARA McKEE, PLAINTIFFS,
v.
HARRIS-SEYBOLD COMPANY, DIVISION OF HARRIS-INTERTYPE CORP.; SEYBOLD MACHINE CO.; CARL W. HAGMAN AND MIEHLE-GOSS-DEXTER, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 2, 1970.
*558 Messrs. Harrison, Hartman & MacDonald, attorneys for plaintiffs.
Messrs. Morrison, Lloyd & Griggs, attorneys for defendants Harris-Seybold Company, Division of Harris-Intertype Corp. and Seybold Machine Co.
Mr. Donald B. Kaufman, attorney for defendant Carl W. Hagman.
Mr. Norman S. Costanza, attorney for defendant, Miehle-Goss-Dexter, Inc.
BRESLIN, R.W., J.D.C. (temporarily assigned).
This matter arises out of a motion for summary judgment in favor of defendant Harris-Seybold Company, Division of Harris-Intertype Corp., on the amended complaint filed by plaintiffs and cross-claims asserted by the co-defendants.
*559 Plaintiff Edward B. McKee contends that on January 18, 1968, while an employee of the American Mission to the Greeks, Inc., Ridgefield, New Jersey, he sustained serious personal injuries while operating a paper cutting machine known as a "Dayton." The machine was manufactured in 1916 by the Seybold Machine Company of Dayton, Ohio. On November 22, 1926 Seybold entered into a contract with the Harris Automatic Press Company of Cleveland, Ohio, whereby it agreed to sell certain assets and Harris Automatic agreed to assume specified liabilities, as more particularly set forth in a contract of sale. Said contract was assigned to a new corporation, Harris-Seybold-Potter Company, and was consummated by the parties. Subsequent thereto Harris-Seybold-Potter changed its name to Harris-Seybold Company and thereafter acquired the Intertype Corporation.
In the agreement between Seybold and Harris Automatic the former sold its property, assets, business and good will and authorized the use of the names "The Seybold Machine Company" and "Seybold." Seybold agreed to change its corporate name to eliminate the word "Seybold," to not thereafter engage in any active manufacturing business and to hold Harris harmless from any undisclosed or contingent obligations not incurred in the ordinary course of manufacturing business since June 30, 1926. In accordance with the agreement Seybold changed its name to the Washington Machine Company, which was subsequently dissolved on February 9, 1928. Defendant Harris-Seybold Company Division of Harris-Intertype Corp. (hereinafter Harris) contends that it did not assume any contingent liability of the Seybold Machine Company arising out of (1) the alleged negligent design and manufacture of the machine in question by Seybold, (2) any express or implied warranties arising out of said sale, or (3) the defective design or manufacture of the machine. It further contends that it did not incur any liability by virtue of informing plaintiff's employer that the machine could be serviced by defendant Hagman. The claims asserted by plaintiff Edward McKee *560 against Harris are set forth in the first, second, third and fifth counts of the complaint. The fourth count is directed against defendant Hagman and alleges that he was negligent and careless in the servicing of the machine. The seventh count is directed against defendant Miehle-Goss-Dexter, Inc. (hereinafter Miehle) and alleges that it installed a safety device on said machine which was defective in design and manufacture and that it impliedly and expressly warranted that said safety device was for the intended purpose.
Defendant Hagman is the owner of a business in Long Island City, New York, which services and repairs paper cutting machinery, manufactures parts for obsolete machines and supplies parts for machines of various sizes and molds. On the recommendation of Harris his company made a service call to the American Mission on July 25, 1967. An employee, Conrad Nagel, reset the clutch of the Dayton machine and checked its operation to determine if it had the power to go through the heavy lip of paper. The only other contact with the American Mission was the sale of two used cutting knives for the machine on November 29, 1967. The knives were installed by employees of American Mission.
Defendant Miehle sells paper cutting machines, paper drilling machines, PMC die cutting and presses. In 1957 it acquired the E.P. Lawson Division. In 1936 Lawson designed a one-hand, two motion position knock-out device which it installed on the Dayton machine in question in order to comply with the requirements of New York State Department of Labor, and there was placed on the machine a label bearing the name E.P. Lawson, Inc., with the approval number 2172. It was an additional safety device to the one incorporated in the machine and known as a safety stop. Harris had no transaction or communication with the Lawson Company relating to the safety device.
Preliminarily, it must be noted that neither party requested this court to take judicial notice of Ohio law, *561 pursuant to Evidence Rule 9. Although Ohio may have the most substantial contacts with the instant matter, in that the contract in question was made and performed in Ohio by Ohio corporations, the subject matter of the contract being the sale of assets located mostly in Ohio, HIMC Investment Co. v. Siciliano, 103 N.J. Super. 27 (Law Div. 1968); Woll v. Dugas, 104 N.J. Super. 586 (Ch. Div. 1969); Mellk v. Sarahson, 49 N.J. 226 (1967), this court will, nevertheless, apply the law of our own jurisdiction as the forum's choice of law. See Evidence Rule 9; Graulich Caterer, Inc. v. Hans Holterbosch, Inc., 101 N.J. Super. 61, 66 (App. Div. 1968); Donnelly v. United Fruit Co., 75 N.J. Super. 383, 397 (App. Div. 1962), aff'd 40 N.J. 61 (1963). Parenthetically, the laws pertaining to the instant issue are basically uniform throughout the country, and since Ohio law is essentially similar to our own, neither party will be prejudiced by the court's adherence to New Jersey law.
It is the general rule that where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor, including those arising out of the latter's tortious conduct, except where: (1) the purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape liability for such debts. Jackson v. Diamond T. Trucking Co., 100 N.J. Super. 186 (Law Div. 1968); Andres v. Morgan, 62 Ohio St. 236, 56 N.E. 875 (Sup. Ct. 1900); Ruedy v. Toledo Factories Co., 61 Ohio App. 21, 22 N.E.2d 293 (App. Ct. 1939); Kloberdanz v. Joy Mfg. Co., 288 F. Supp. 817 (D. Colo. 1968); 19 Am. Jur.2d, § 1546, at 922. A fifth execption, sometimes incorporated as an element of one of the above exceptions, is the absence of adequate consideration for the sale or transfer. 19 Am. Jur.2d, § 1551, at *562 927; 7 Fletcher, Cyclopedia of Corporations, § 4751 (1919 ed.).

I
Liability cannot be impressed upon the movant under the first exception. The contract in question provided that the purchaser and its successors, i.e., the movant, assume certain liabilities of the seller (Seybold) enumerated in the contract. These specific liabilities were open accounts for purchasers, accrued water bills, local taxes, payroll accounts, past federal taxes owing, if any, certain sales representative contracts, and current obligations of the seller for purchase of materials and supplies and for the delivery of manufactured goods. These liabilities were in existence at the time the balance sheet attached to the contract was prepared. Since the contract was not to be consummated until February 1, 1927, it was also provided that the purchaser assume the liabilities incurred by Seybold "in the usual course of its manufacturing business, but not otherwise" subsequent to June 30, 1926  the date the balance sheet was prepared. (Seybold's earnings from that date were to be assigned to the buyer). In paragraph eight of the contract Seybold warranted that there were "no undisclosed or contingent obligations" of Seybold not specified in the contract, and that Seybold would hold the purchaser harmless from such undisclosed or contingent obligations.
A contract must be construed as a whole and the language employed must be given its ordinary meaning, in the absence of anything to show that the language was used in a different sense. Hudson County Newspaper Guild v. Jersey Pub. Co., 19 N.J. Super. 440 (Law Div. 1952), aff'd 23 N.J. Super. 419 (App. Div. 1952); S.G. Young, Inc. v. B. & C. Distributors Co., 23 N.J. Super. 15 (App. Div. 1952). Provisions of a contract must be interpreted, if possible, so as to give effect to the general purpose and intention of the parties. Josefowicz v. Porter, 32 N.J. Super. 585 (App. Div. 1954). It is clear that there was no *563 express assumption by the purchaser of any liabilities except those designated in the contract. It is equally manifest that the purchaser's assumption of those obligations incurred by the seller in the "usual course of manufacturing" subsequent to June 30, 1926 does not include the type of contingent liability herein sought to be imposed. "Usual" is variously defined to mean that which happens in the ordinary course of events, that which is customary or according to common practice. Dancy v. Abraham Bros. Packing Co., 171 Tenn. 311, 102 S.W.2d 526 (Sup. Ct. 1937); Roberts Coal Co. v. Corder Coal Co., 143 Va. 133, 129 S.E. 341 (Sup. Ct. App. 1925); People v. Carman, 385 Ill. 23, 52 N.E.2d 197 (Sup. Ct. 1943). The liabilities incurred by Seybold prior to June 30, 1926, expressly assumed by the purchaser, were those incident to regular upkeep of manufacturing operations, e.g., obligations for materials and supplies purchased. The liabilities incurred by Seybold in the usual course of manufacturing subsequent to June 30, 1926, which were also expressly assumed by the purchaser, were not intended to be of an all-inclusive nature, but rather of the same type as those incurred prior to the above date. This is so especially in view of the restrictive language that appears immediately after "in the usual course of manufacturing business," i.e., "but not otherwise." There was no contractual express or implied assumption of contingent tort liability.

II
Plaintiff also asserts that the transaction in dispute was not a mere sale of assets but a de facto merger or consolidation which would render the movant liable for the torts of Seybold. In Applestein v. United Board & Carton Corp., 60 N.J. Super. 333 (Ch. Div. 1960), aff'd 33 N.J. 72 (1960), the court stated:
A merger of corporations is the absorption by one corporation of one or more usually smaller corporations, which lose their identity *564 by becoming part of the large enterprise * * * A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain. In a consolidation, the two corporations unite and both go out of existence, and a new amalgamated corporate enterprise takes the place of the former corporations. [at 342]
And the court in Sterling v. Mayflower Hotel Corp., 33 Del. Ch. 293, 93 A.2d 107, 38 A.L.R.2d 425, 434 (Ch. 1952), held:
A merger may be said to "involve" a sale of assets, in the sense that the title to the assets is by operation of law transferred from the constituent corporation to the surviving corporation; but it is not the same thing. * * * A merger ordinarily contemplates the continuance of the enterprise and of the stockholders' investment therein, though in altered form; a sale of all assets * * * ordinarily contemplates the liquidation of the enterprise.
In Cortland Specialty Co. v. Comm'r of Internal Revenue, 60 F.2d 937 (2 Cir.1932), the court distinguished a sale of assets from reorganization, merger and consolidation, stating that the latter indicated corporate readjustments of existing interests, whereas in the former the vendor corporation parts with its interest for cash and receives nothing more.
The court in Applestein v. United Board & Carton Corp., supra, held that the nature of the transaction there involved was in effect a merger rather than a sale of corporate properties. In so holding, however, it stressed the fact that the head of the selling corporation would have virtual control over the purchasing corporation; the transaction was designated in the proxy statement as a "polling of interests"; it was intended that the selling company be dissolved; it was provided that the vendee would assume all of the vendor's liabilities, and the executive and operating personnel of the vendor would be retained by the vendee.
Although not every element found in Applestein is essential in the determination of a de facto merger, Good v. Lackawanna Leather Co., 96 N.J. Super. 439 (Ch. Div. *565 1967), the court in the latter case noted certain key elements present in Applestein which were absent in the case before it. Thus, the court held that since there was no transfer of the assets and business of the one corporation in exchange for the shares of the other corporation, there was no ceasing of corporate functions by the transferee and there was no assumption of liabilities by the transferee, there was no de facto merger or consolidation.
In Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25, 31 (1958), the Supreme Court of Pennsylvania held:
* * * When as part of a transaction between two corporations, one corporation dissolves, its liabilities are assumed by the survivor, its executives and directors take over the management and control of the survivor, and, as consideration for the transfer, its stockholders acquire a majority of the shares of stock of the survivor, then the transaction is no longer simply a purchase of assets or acquisition of property * * * but a merger. * * *
The court in Marks v. Autocar Company, 153 F. Supp. 768 (E.D. Pa. 1954) also examined the corporate transaction involved there, designated a sale, and stated:
Of course, there was a transfer of assets for a consideration, which could be properly designated a sale, but every merger has in it the elements of a transfer for consideration. Autocar's business was taken over by White which has, since the transfer, been conducting it as a division of its company. Autocar has been or is about to be dissolved and will cease to exist as a corporate entity abandoning its name and legal identity. When the transaction is completed, all of its stockholders will have passed into White and will have become members thereof. White has assumed all of the liabilities of Autocar and has acquired its goodwill and the right to use the name. [at 770]
In the present case Seybold sold all its assets, including its physical assets, patents and its good will and the right to use its name. It cannot be argued that it was not a complete transfer. However, the consideration paid to Seybold for the transfer was almost $2 million in cash and *566 5,500 shares of the vendee's common stock. It was not a transfer for securities alone. The shares paid as consideration amounted, in fact, to only a negligible part of the total purchase price. Since the overwhelming portion of the consideration was cash, there was little, if any, continuity of stockholder interest in the purchasing corporation.
The contract also provided that Seybold was to change its name to eliminate the word "Seybold." The seller was also required to refrain from engaging in any manufacturing business, and its president, Charles Seybold, was also restricted from engaging in any manufacturing operations similar to the operation to be sold. On January 12, 1927 the stockholders of Seybold voted to change the corporate name to the "Washington Machine Company," and the latter continued in existence at the time of the sale and for a period of one year thereafter. The Washington Machine Company was dissolved in February, 1928. The identity of the corporation and of its stockholders as an integral part of the corporate identity was not eradicated by the transfer. The corporation could no longer function as a manufacturer, yet it could and did operate and function as a corporation for some time after the sale. The vendor corporation, as a corporate entity, was not absorbed into the purchasing corporation. What was absorbed was the nature of the manufacturing operations previously engaged in by Seybold, not the Seybold corporate entity itself. The stockholders of Seybold continued to remain stockholders of the Washington Machine Company. The two corporations, Seybold and the purchaser, were strangers before the sale and continued to remain strangers after the sale. See Kloberdanz v. Joy Mfg. Co., supra; Lamb v. Leroy Corp., 454 P.2d 24 (Nev. Sup. Ct. 1969). If the vendor corporation receives the consideration for the transfer, as opposed to those situations where the stockholders directly receive the same, and that corporation is thereby kept alive, there seems to be nothing in the nature of merger or consolidation. 44 Harv. L. Rev., at 263.
*567 Furthermore, there is here no broad assumption of liabilities such as is usually present in de facto merger situations, and, on the face of the contract and the exhibits offered, there is nothing that can be remotely construed as evidence of an intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.
It may be argued that since the purchaser caused a new corporation to come into existence and succeed to the former's rights under the contract, a consolidation was in reality accomplished. However, although the new corporation, "Harris-Seybold-Potter," did take over the operations of the purchaser and those sold to it by Seybold, the Seybold corporate entity still enjoyed its separate and distinct identity after the transfer. Moreover, the new corporation was brought into being solely through the efforts of the purchaser, not through any activity of Seybold.
The transfer in question was not a de facto merger or consolidation so as to render the movant liable for Seybold's torts.

III
Plaintiff also asserts that the movant (including its predecessors) was a mere continuation of the vendor corporation. As authority it cites Jackson v. Diamond T. Trucking Co., supra, 100 N.J. Super. 186. In that case, one Taylor, president, director and principal stockholder of Diamond T., in furtherance of his desire to acquire the assets of Phillips, a trucking corporation, contracted with the latter's owner for the sale of Phillips' assets for a specified consideration. In the contract Taylor, individually, was the named buyer, but there was a provision for the assignment and transfer of the rights and assets covered by the contract to Diamond T. The buyer was to assume no liabilities of Phillips. Taylor operated Phillips for some time after the sale until the I.C.C. approved the transfer of the franchise to Diamond T. The transfer to Diamond T. from Taylor as head of Phillips was without *568 consideration. The court held that Diamond T. was liable for the debts of Phillips since (1) the transfer was without consideration; (2) Taylor as the president, director and principal stockholder of both Phillips and Diamond T., affected the transfer; (3) Taylor had actual knowledge of plaintiff's claim; (4) Diamond T. was presently operating out of the Phillips' buildings with some of Phillips' trucks, and (5) Phillips had no assets to pay plaintiff's claim and was dissolved in fact, no longer conducting any operations.
The court in Jackson reviewed previous New Jersey cases touching upon the subject matter and noted, that in each case where the vendee corporation was held liable there was present
* * * (1) transfer of corporate assets (2) for less than adequate consideration (3) to another corporation which continued the business operation of the transferor (4) when both corporations had at least one common officer or director who was in fact instrumental in the transfer (except in the Aetna case where there was, however, actual knowledge of the transferor's financial condition) and (5) the transfer rendered the transferee incapable of paying its creditors' claims because it was dissolved in either fact or law. [at 196]
See Parsons Mfg. Co. v. Hamilton Ice Mfg. Co., 78 N.J.L. 309 (Sup. Ct. 1909); Chorpenning v. Yellow Cab Co., 113 N.J. Eq. 389 (Ch. 1933), aff'd 115 N.J. Eq. 170 (E. & A. 1933); Couse v. Columbia Powder Mfg. Co., 33 A. 297 (Ch. 1895) (not officially reported); Aetna, etc., Co. v. International, etc., Corp. 117 N.J. Eq. 190 (Ch. 1934); Fox v. Radel Leather Mfg. Co., 121 N.J. Eq. 291 (E. & A. 1936).
The Jackson court noted the dictum in the Parsons case:
In addition to discussing principles of novation and estoppel, the court said: "There is ample authority also to support the proposition that the defendant, having taken over the assets of the former company for the purpose of carrying on its business, without apparent change in the personnel of the concern, is liable for the payment of the debts of the former concern * * *" [at 194]
*569 However, the court questioned the accuracy of the statement in light of the general rule that when a sufficient consideration is paid for the assets of a corporation, there is no liability, in the absence of fraud or an agreement to assume the debts, even though the vendee corporation was in fact organized by the stockholders or members of the vendor corporation. See 19 Am. Jur.2d, § 1546, at 922-923. The court concluded that the fact that the transferee is a continuation of the transferor corporation does not always mean that the transferee is legally liable for the transferor's obligations:
Many facts and policy factors must be weighed in the balance, most importantly, the policy protecting corporate creditors must be weighed against the equally important policy respecting separate corporate entities. [at 196]
Courts in other jurisdictions have repeatedly dealt with allegations of corporate continuations. In Kloberdanz v. Joy Mfg. Co., supra, 288 F. Supp. 817, the court stated:
Nor can the buyer be said to be a mere continuation of the seller. [The seller] continued to exist after the sale [for 8 months], and theer was no common identity of stock, directors, officers or stockholders between Joy and [the seller]. This exception covers a reorganization of a corporation. 15 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 7122, at 194-196 and nn 41-43 (1961 Rev. Vol.) There is no evidence of this here. [at 821]
In Andres v. Morgan, supra, 62 Ohio St. 236, 56 N.E. 875, the court held:
* * * where a mere transformation is had,  parties remaining the same  and the property is transferred by members of the old company transferring their interest in it for an equal interest in it as property of the new, the transaction does not constitute a sale by the one and a purchase by the other. It is simply a change in the manner and form of carrying on the same business by the same persons. [56 N.E., at 877]
*570 In Jones v. Eppler, Okl. 266 P.2d 451 (1953), the Supreme Court of Oklahoma held that where there was no consideration other than the purchasing corporation's stock issued to the individual executives of the selling corporation, all the assets of the purchaser were derived from the seller, the new corporation remained under the same management, and the business was continued in the same manner as before, liability for the debts of the seller would attach to the new corporation.
In the instant case there was presumably a continuity of actual manufacturing operations. The lands, buildings, machinery and tradenames were sold, and it is apparent that the purchaser intended to make use of all these in the manufacture of the same type of product. It was also stipulated in the contract of sale that the purchaser would employ the vice-president, secretary and treasurer of Seybold at the respective individual's request. The length of required employment was one year. However, this provision was merely to insure the economic stability of those officers immediately after the transfer. The contract did not state the capacity in which they were to be employed. In short, there is no evidence of continuity of management. As stated previously, there was also no continuity of stockholder investment, and the selling corporation retained its separate identity well after the sale took place. Neither were there common directors or officers at the time of the sale. When one company purchases all the assets of another, it is to be expected that the purchasing corporation will continue the operations of the former, but this does not by itself render the purchaser liable for the obligations of the former. For liability to attach, the purchasing corporation must represent merely a "new hat" for the seller. Bergman & Lefkow Insurance Ag. v. Flash Cab Co., 110 Ill. App.2d 415, 24 N.E.2d 729 (App. Ct. 1969). The purchaser-movant was not such a continuation of Seybold as to render it liable for the latter's torts.

*571 IV
Nor can the plaintiff impose liability under the fourth or fifth exceptions. There is no hint of fraud in the transaction, and the consideration paid for the transfer was in excess of the value of the assets received as set forth in the balance sheet attached to the schedule. The main reason why the courts impose liability upon the purchasing corporation when it has not given adequate consideration is that the seller will be thereby rendered insolvent and unable to pay its debts. See West Texas Refining & D. Co. v. Comm'r of Internal Revenue, 68 F.2d 77 (10 Cir.1933). The court there stated:
It is equally well settled when the sale is a bona fide transaction, and the selling corporation receives money to pay its debts, or property that may be subjected to the payment of its debts and liabilities, equal to the fair value of the property conveyed by it, the purchasing corporation will not, in the absence of a contract obligation or actual fraud of some substantial character, be held responsible for the debts or liabilities of the selling corporation. [at 81]
The court in Lamb v. Leroy Corp., supra, 454 P.2d 24, held that where a purchasing corporation gives its stock as consideration paid to the selling corporation directly and not to its stockholders, liability is thereby avoided. In such transaction a valuable asset is given to the seller and is subject to creditors' claims and the creditor cannot complain unless the consideration was not fair or adequate. The court also noted that it is immaterial whether the consideration was in the form of cash or stock. And in Pringle v. Hunsicker, 154 Cal. App.2d 789, 316 P.2d 742 (D. Ct. App. 1957), the court stated that continuity of management, absence of adequate consideration for the transfer and failure to leave enough assets with the vendor corporation for the payment of its debts, are factors essential to the application of the rule that the vendee corporation is liable for the vendor's debts when the former is organized *572 by the operators of the vendor corporation. See also Jackson, supra.
In Kloberdanz v. Joy Mfg. Co., supra, the court set forth the general rule applicable to a sale of corporate assets and the four exceptions to it. It did not place the absence of adequate consideration in a separate category but recognized its importance as a factor to be weighed.
Although the general rule speaks of a transfer of all a corporation's assets, the emphasis should be on whether the sale was a bona fide one involving the payment of money or property to the selling corporation whereby it can respond in actions like the present one. The transfer of assets in this case was made for a good and valuable consideration * * * and there is not hint of fraud * * * it follows that unless the sale of (seller's) assets to Joy falls into one of the four recognized exceptions, the general rule would apply. * * * [288 F. Supp., at 820-821]
Here, Seybold received almost $2 million and 5,500 shares of movant's stock. In light of the value of the assets transferred, the consideration was sufficient and the transaction left Seybold well able to respond to the claims of creditors.

V
Plaintiff also contends that the movant is liable for its negligence in recommending defendant Hagman to repair the machine which allegedly caused the subsequent injury to the plaintiff. However, he cites no cases in support, and this court can find none. Defendant cites authority for a parallel position that a recommendation of one physician by another will not subject the latter to liability for the recommendation, absent a showing of partnership or employment or agency, unless the recommending physician did not exercise due care in making the recommendation. The recommended physician is treated as an independent contractor, liable for his own torts. Graddy v. New York Medical College, 19 A.D.2d 426, 243 N.Y.S.2d 940 (App. Div. 1963); Oldis v. La Societe Francaise De Bienfaisance *573 Mut., 130 Cal. App.2d 461, 279 P.2d 184 (D. Ct. App. 1955); Huber v. Protestant Deaconess Hospital Ass'n., 127 Ind. App. 565, 133 N.E.2d 864 (App. Ct. 1956); Myers v. Holborn, 58 N.J.L. 193 (E. & A. 1895); 70 C.J.S. Physicians & Surgeons § 54, at 978. The singular and vital profession of medicine may be the main factor in the imposition of any duty at all upon a physician who, in the course of his treatment, recommends another physician.
However, presuming the application of this rule to the movant, it is clear from the proofs that there is no employment relationship existing between defendant Hagman and the movant. Nor is there the slightest evidence of agency or partnership. Hagman is an independent contractor who undertook to repair the machine in question, and any liability arising out of the alleged negligent repair should be exclusively visited upon him. Plaintiff has brought forward no proof whatsoever showing movant's lack of due care in recommending Hagman. On the contrary, the testimony adduced at depositions supports a finding that Hagman or his employee was well qualified to perform any repairs on a machine of this type. Once the movant has demonstrated a prima facie right to summary judgment, it is incumbent upon the movee to produce some proof in opposition thereto. N.J. Mtg. & Inv. Corp. v. Calvetti, 68 N.J. Super. 18 (App. Div. 1961). Such required proof is not here present.

VI
Plaintiff has also urged liability upon the movant on the ground that its "alter ego," the Lawson Company (now a division of defendant Miehle-Goss-Dexter, Inc.), designed and installed a defective safety device upon the machine in question. The Lawson Company was until the time of its acquisition by defendant Miehle-Goss-Dexter an individual corporate entity, distinct from the movant. The *574 allegation that it was the movant's "alter ego" is a mere legal conclusion and suffers from the same lack of proof required to pierce the corporate veil.
The motion is therefore granted and judgment will be entered dismissing the amended complaint and the cross-claims as to defendant Harris.