**Mahin R. F. LADJEVARDIAN and Zohreh Ladjevardi, Plaintiffs,**

v.

**LAIDLAW–COGGESHALL, INC., Lac, Inc., Joseph R. Lauzon and Henry B. Laidlaw, Defendants.**

No. 74 Civ. 1196.

United States District Court, S. D. New York.

May 12, 1977.

836

Cuddy & Feder, and Myron S. Isaacs, White Plains, N. Y., for plaintiffs; Myron S. Isaacs, White Plains, N. Y., Thomas R. Beirne, New York City, of counsel.

White & Case, New York City, for defendant Laidlaw-Coggeshall, Inc.; Vincent R. Fitzpatrick, Jr., J. Hayes Kavanagh, New York City, of counsel.

Charles Crocco, New York City, for defendants, Joseph R. Lauzon and Henry B. Laidlaw.

Joshua Angel, Narcus & Angel, New York City, for defendant LAC, Inc.

LASKER, District Judge.

Mahin R. F. Ladjevardian and Zohreh Ladjevardi sue Laidlaw-Coggeshall, Inc., LAC, Inc., Joseph R. Lauzon and Henry B.

Laidlaw, alleging securities laws violations.[1] Lauzon is a registered stock broker, employed successively by LAC (then known as Laidlaw, Inc.), and Laidlaw-Coggeshall which acquired the assets of LAC in April, 1973. Laidlaw was at all relevant times Lauzon's superior. Plaintiffs allege that Lauzon, who was their broker, churned their accounts, engaged in unauthorized trading, falsified statements and generally abused plaintiffs' trust. Laidlaw and the corporate defendants are alleged to have induced and participated in the fraud by improperly supervising the accounts, rewarding Lauzon for producing excessive commissions and profits and "abusing the plaintiffs' confidence."

Laidlaw-Coggeshall moves for summary judgment, urging that as a matter of law it is not liable for any wrongs committed prior to its acquisition of LAC's assets, when Laidlaw and Lauzon became its employees. It further asserts that it did nothing illegal with respect to plaintiffs' accounts during the period after the acquisition. Plaintiffs take issue with both propositions, contending that Laidlaw-Coggeshall assumed the liabilities of Laidlaw, Inc., and that independent wrongs were committed during the period it handled their accounts.

I.

Plaintiffs opened securities accounts with the partnership known as Laidlaw & Company in 1966. In 1969, when the partnership incorporated, their accounts were automatically transferred to Laidlaw, Inc., the newly formed corporation. In 1973, Laidlaw, Inc. entered into an agreement with Coggeshall & Hicks, a brokerage firm, whereby the latter was to acquire certain assets of the former in exchange for payments to Laidlaw, Inc.[2] According to the

terms of the agreement, Laidlaw, Inc., was to change its name to one not involving "Laidlaw" (it chose LAC) and would have no interest in any corporation using the word "Laidlaw" in its name except for a pre-existing interest in two Canadian firms. (¶ 1.2 Exhibit A, Affidavit of Robert H. Clayton, July 22, 1976) Coggeshall & Hicks was thereafter to be known as Laidlaw-Coggeshall, Inc. and was to acquire, in addition to office leases, fixtures, and leasehold improvements, such employees and customer accounts of Laidlaw, Inc. as Laidlaw-Coggeshall requested. After the acquisition, certain employees of Laidlaw, Inc., notably co-defendants Henry B. Laidlaw, who was President of Laidlaw, Inc. and remains President of LAC, and Joseph Lauzon, a registered broker were retained by Laidlaw-Coggeshall. Henry Laidlaw became a Senior Vice-President, director and voting stockholder of Laidlaw-Coggeshall, and Joseph Lauzon continued to be employed as a stock broker.

Prior to the acquisition, "Mahin" and "Zohreh" were notified of the pending transaction and advised that unless they objected, their accounts would be transferred to Laidlaw-Coggeshall. The notice referred to the transaction as a "combination of the two firms" and a later memorandum confirmed the fact that the accounts had been transferred pursuant to the firms' "merger agreement dated April 13, 1973."

Early in 1973, before the acquisition, Mahin and Zohreh became dissatisfied with the services of Laidlaw, Inc., and instructed that firm to make no further purchases on their behalf except with their written authorization. They also made several demands on Laidlaw, Inc., including the delivery of Zohreh's stocks to Chase Manhattan

---

1. Defendants are charged with violating sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. 78j(b), 78t(a); SEC rule 10b–5, 17 C.F.R. § 240.10b–5; § 17(a) of the Securities Act, 15 U.S.C. § 77q(a) and Regulation T of the Board of Governors of the Federal Reserve System, 12 C.F.R. Part 220.

2. For each of the years ending March 31, 1974 through 1989, LAC was and remains entitled to

the lesser of $75,000 or 20% of Laidlaw-Coggeshall's net income, provided the aggregate does not exceed $750,000. An additional amount, not to exceed $200,000, would be paid in the event that LAC were required to make any payments, pursuant to a binding arbitration award to Hayden Stone, Inc., the company which had financed its customer margin accounts.

Bank. These demands were allegedly not met. According to the plaintiffs, from September 1970 through December 1972, Laidlaw, Inc., Lauzon and Henry B. Laidlaw, "fraudulently churned and milked" their accounts by means of "unauthorized borrowings of funds and securities, churning of accounts, false and misleading representations . . . and other breaches of trust and violations of securities laws and regulations thereunder." (¶ 4 Affidavit of Myron S. Isaacs, August 31, 1976) Although the churning had concededly ended by December 1972, the plaintiffs charge that the "milking continued, with Laidlaw-Coggeshall collecting all that was left in Mahin's account . . . and [substantial amounts] from Zohreh's account . . . plus $1,442 in commissions." (Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment at 9) Plaintiffs seek to hold Laidlaw-Coggeshall liable for these actions which occurred between April 16, 1973 and December 31, 1973 when their associations with that firm ended.

According to plaintiffs, although LAC continued in existence after the sale, it was no more than an "inactive shell" and has now executed an Assignment for the Benefit of Creditors. (¶ 2(b) Supplemental Affidavit of Myron Isaacs, September 18, 1976) They do not, however, assert that the sale was fraudulent or that LAC received inadequate consideration for its assets.

## II.

### Corporate Liability for the Debts of a Predecessor

 A corporation that purchases the assets of another company is not liable for the liabilities of its predecessor absent a showing that 1) it expressly or impliedly agreed to assume the liabilities; 2) there was a merger or consolidation of the two firms, or 3) the buyer is a "mere continuation" of the seller.[3] *Kloberdanz v. Joy,* 288 F.Supp. 817, 820 (D.Colo.1968), citing, 15 Fletcher, Cyclopedia of Law of Private Cor-

porations § 7122 (1961 Rev.Vol.) In the instant case plaintiffs have failed to establish that either of the last two exceptions to the general rule of nonliability is applicable. However, on the present record it is not possible to determine whether or not Laidlaw-Coggeshall impliedly assumed liability for the debts of LAC. Such a finding can only be made after the facts have been fully developed at trial. Accordingly, for reasons set forth in detail below, Laidlaw-Coggeshall's motion for summary judgment as to its liability for the acts of its predecessor must be denied.

### Merger or Consolidation

 A successor corporation is liable for the debts of its predecessor where there is a merger or consolidation of the two firms. A merger contemplates the "absorption of one corporation by another which retains its name and corporate identity with the added capital, franchises and powers of a merged corporation." Absent compliance with statutory requirements a merger may be considered *de facto.* See *Kloberdanz, supra.* Fletcher, *supra* § 7041. A consolidation envisions the joining together of the two corporations so that a totally new corporation emerges and the two others cease to exist. The fact that the companies might have described their agreement as a "merger" or "consolidation" is not controlling. *Metropolitan Edison Co. v. Commission of Internal Revenue,* 98 F.2d 807, 809 (3d Cir. 1938), aff'd, 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957 (1939). Nor is the fact that the purchaser adopted part of the seller's name. See *McKee v. Harris-Seybold Co.,* 109 N.J.Super. 555, 264 A.2d 98 (1970), where the vendor sold its name, good will, and agreed to change its name, and the purchaser retained the vendor's vice-president, secretary and treasurer in its employ for one year following the sale. The fact that the two corporations have an identity of members or officers does not necessarily suggest that the corporations do not have a

---

**3.** Fraud in the acquisition of the selling corporation will also give rise to liability. *Kloberdanz v. Joy,* 288 F.Supp. 817, 820 (D.Colo. 1968). Since the instant case involves no allegations of fraudulent acquisition, however, it is unnecessary to consider this exception.

separate identity. *Id.,* see also *Owl Fumigating Corp. v. California,* 24 F.2d 718 (D.Del.1928), aff'd, 30 F.2d 812 (3d Cir. 1929); *Hudson Minneapolis, Inc. v. Hudson Motor Car Co.,* 124 F.Supp. 720 (D.Minn. 1954). Rather, to find that a *de facto* merger has occurred there must be a continuity of the selling corporation, evidenced by the same management, personnel, assets and physical location; a continuity of stockholders, accomplished by paying for the acquired corporation with shares of stock; a dissolution of the selling corporation, and the assumption of liabilities by the purchaser. *Shannon v. Samuel Langston Company,* 379 F.Supp. 797 (W.D.Wis.1974). See generally, *Cortland Specialty Co. v. Commissioner of Internal Revenue,* 60 F.2d 937 (2d Cir. 1932).

█ In the case at bar there was neither a consolidation nor a merger, for LAC continued to exist after the sale and continues to be entitled to the installment payments for the assets. Moreover, the purchase of assets was not effected through the exchange of stock and the two corporations have retained separate identities, notwithstanding the fact that there is an identity of certain employees and of one officer. See generally, *Menacho v. Adamson United Co.,* 420 F.Supp. 128 (D.N.J.1976).

### The Vendee as a Mere Continuation of the Vendor

█ The next exception to the general rule of nonliability occurs where the successor corporation is a mere continuation of the seller. For this exception to come into operation "the purchasing corporation must represent merely a 'new hat' for the seller." *McKee v. Harris-Seybold Co., supra.* That is, it is not simply the business of the original corporation which continues, but the corporate entity itself. *National Dairy Products v. Borden,* 363 F.Supp. 978 (D.Wis.1973). A continuation envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer. *Kloberdanz, supra.* What it accomplishes is something in the nature of a corporate reorganization, rather than a mere sale. There has been no showing in the case at bar of such an identity of the two corporations as to make Laidlaw-Coggeshall a mere continuation of LAC. All that has been shown is that LAC's President has been retained as a Vice-President of Laidlaw-Coggeshall and that certain customers of LAC were transferred to Laidlaw-Coggeshall at the time of the sale. The fact that the vendor corporation continued to exist after the sale and apparently received fair consideration for its assets is sufficient to take this case out of the "mere continuation" exception.

### Express or Implied Assumption of Liabilities

It is clear that Laidlaw-Coggeshall did not expressly assume the liabilities of LAC. Pursuant to the agreement between the parties the only liabilities Laidlaw-Coggeshall was to assume were those arising from the transferred leases.

█ However, the facts do suggest that there may have been an implied assumption of liability. While no precise rule governs the finding of implied liability, the authorities suggest that the conduct or representations relied upon by the party asserting liability must indicate an intention on the part of the buyer to pay the debts of the seller. *Fletcher, supra* § 7124. The presence of such an intention depends on the facts and circumstances of each case. One of the facts to be considered is the effect of the transfer upon creditors of the predecessor corporation. See, e. g., *In re Alamac Operating Corp.,* 42 F.2d 120 (2d Cir. 1930); *Blackington v. United States,* 6 F.2d 147 (8th Cir. 1925). In the instant case, plaintiffs charge that LAC became a mere "shell" following its agreement with Laidlaw-Coggeshall. Although it continues to be entitled to installment payments from Laidlaw-Coggeshall, LAC, is not, according to plaintiffs, an active broker-dealer, has no office and has now filed an assignment for the benefit of creditors. (¶ 2(b) Supplemental Affidavit of Myron S. Isaacs, September 18, 1976) Thus, there is a real possibility that the creditors of LAC have been left

without a remedy as a result of the sale to Laidlaw-Coggeshall. In such a situation a finding of an implied assumption is more likely than in a case where the predecessor corporation continues as a viable corporate entity. See generally, *Blackington, supra.*

▆▆▆ Admissions of liability on the part of officers or other spokesmen of the successor corporation are also considered in determining whether implied liability exists. See, e. g., *Hoche Production, S. A. v. Jayark Films,* 256 F.Supp. 291 (S.D.N.Y. 1966) where in pretrial affidavits the accountant and attorney for the successor corporation attested to its intention to assume liability for the contracts of its predecessor. It is arguable that the letter sent by Henry Laidlaw advising customers of the acquisition and its accompanying consent agreement evinces such an intention. The letter provides that Laidlaw & Co. had agreed to combine "certain aspects of its business" with Coggeshall & Hicks, Inc. (Exhibit 1, Affidavit of Myron S. Isaacs, August 31, 1976) It goes on to state that "[u]pon completion of the proposed combination, all accounts of Laidlaw customers will be serviced by Laidlaw-Coggeshall, Inc." *Id.* Finally, it advises that unless an objection is received by the "effective date of the com-bination of the two Firms" the customer accounts would be automatically transferred to Laidlaw-Coggeshall. *Id.* The accompanying consent agreement advised customers that Laidlaw-Coggeshall would assume any credit balance owed to customers of Laidlaw & Co. and that any debit balance would become an obligation of Laidlaw-Coggeshall. An analogous situation was present in *Wilson v. Fare Well Corp.,* 140 N.J.Super. 476, 356 A.2d 458 (Law.Div. 1976) where the court held that liability could be imposed upon an acquiring corporation based, in part, upon letters which the seller sent to its customers advising them to give future orders to the acquiring corporation. The president of the acquiring corporation thereafter sent a letter to its customers advising them that the joining of the two "longstanding" firms would strengthen their efforts to advance the textile industry. Such letters, according to the court, reflected an intention on the part of the acquiring corporation "to assume all benefits and burdens of its predecessor in the continuation of the business." *Id.* 356 A.2d at 467. It is arguable that the assumption of customer credit (and even the debit) balances in the case at bar resulted in an assumption of liabilities connected therewith as a matter of law.[4]

---

4. Plaintiffs have advanced various additional theories of liability. They argue that because Laidlaw-Coggeshall falls within the definition of "successor" set forth in Securities and Exchange Commission Regulation 240.12b–2, 17 C.F.R., it has implicitly assumed the obligations of its predecessor. This assertion, however, is not supported by the authorities. The case upon which plaintiffs rely, *SEC v. Rega,* CCH Fed.Rep. [1975–76 Transfer Binder] ¶ 95,2222 (S.D.N.Y.1975) did not involve transferee liability to third parties, but rather was an injunctive action brought by the SEC against certain defendants who had been found guilty of manipulating stock. Joseph Rega, the President, Chief Executive Officer and principal stockholder of Carleton-Cambridge, a broker-dealer under SEC investigation, redeemed all his voting stock in that corporation, purchased all the stock of an inactive corporation, and changed its name to Christian-Paine. Rega became the President and sole stockholder of Christian-Paine. Thereafter Christian-Paine bought virtually all the assets of Carleton and effected a transfer of the majority of its customer accounts. In this posture the district court found that Christian-Paine was formed merely to continue the operations of Carleton and thus could be properly enjoined, along with its predecessor, from engaging in any further violations of the securities laws. There was no discussion of transferee liability to third parties. Moreover, on the facts of the case, the court was justified in finding that Rega had been an active participant in the fraud of the selling corporation, and, in fact, formed the new corporation to continue that fraud.

Plaintiffs also claim that Laidlaw-Coggeshall became the "successor trustee" of LAC and therefore was liable for the misdeeds of its predecessor. While it is undoubtedly true that a broker owes a fiduciary duty to its customers, *Opper v. Hancock Securities Corp.,* 250 F.Supp. 668 (S.D.N.Y.), aff'd, 367 F.2d 157 (2d Cir. 1966), this duty is more in the nature of a constructive trust rather than an express trust. Be that as it may, even a successor trustee of an express trust is not personally liable for the liabilities of its predecessor unless it agrees to assume them. Bogart, Law of Trusts and Trustees, ¶ 701 at 402 (2d ed.). See also *Jongers v. First National Trust & Deposit Co.,* 147 Misc.

## III.

*Laidlaw-Coggeshall's Alleged Wrongdoing*

In their complaint, plaintiffs charge that between September 30, 1970 and November 30, 1973 Laidlaw-Coggeshall, together with LAC and defendant Lauzon, fraudulently churned the accounts of Mahin and Zohreh, taking excessive commissions and interest as a result. (Amended Complaint ¶¶ 28, 39) However, in their memorandum opposing the motion for summary judgment, plaintiffs concede that the churning of plaintiffs' accounts ended in December 1972 (well before the sale of assets to Laidlaw-Coggeshall), while continuing to assert that the "milking continued with Laidlaw-Coggeshall collecting all that was left in Mahin's account . . . and approximately $109,500 from Zohreh's account, a total of approximately [139,400]." (Memorandum in Opposition to Motion for Summary Judgment at 9) What plaintiffs mean by the term "milking" is nowhere explained, and the vague assertions of mismanagement are simply insufficient to defeat Laidlaw-Coggeshall's motion for summary judgment. Plaintiffs have demonstrated no acts for which Laidlaw-Coggeshall can be held liable. In opposing the motion for summary judgment, plaintiffs have set forth in detail the amount of interest charged to their accounts during the period from April 16, 1973 through December 31, 1973, when plaintiffs' association with Laidlaw-Coggeshall ended. They also refer to one oversale of stock in Mahin's account which realized a loss of $403.67 for her, but which earned commissions for Laidlaw-Coggeshall. Nowhere, however, do plaintiffs refer to any authority which would suggest that those transactions were illegal. In fact, it appears that they were not illegal, for Laidlaw-Coggeshall has set forth every sale that took place together with sworn statements of its President, the Manager of its margin account and its margin clerk, attesting to the fact that these sales were made only to meet the margin requirements of the New York Stock Exchange and that one purchase was made to correct an oversale. By means of these sales Laidlaw-Coggeshall was able to recoup the debit balance of customers which it assumed from Hayden-Stone, LAC's clearing broker, when it acquired plaintiffs' accounts. Since plaintiffs do not effectively dispute these explanations, the conclusion is inescapable that Laidlaw-Coggeshall has not violated the securities laws with respect to their handling of plaintiffs' accounts after April 16, 1973.

While summary judgment should not be granted where genuine issues of material fact exist, and all doubts should be resolved in favor of the non-moving party, *United States v. J. B. Williams,* 498 F.2d 414 (2d Cir. 1974), it remains a vital tool for "pierc[ing] . . . claims and resolv[ing] actions where the facts are undisputed . . . ." *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 278 (2d Cir. 1968), *cert. denied,* 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). Where, as here, there is no genuine factual dispute, summary judgment is proper. *United States v. J. B. Williams, supra.*

Laidlaw-Coggeshall's motion for summary judgment is denied with regard to its liability to plaintiffs for the acts of LAC. The motion for summary judgment is

---

260, 263 N.Y.S. 619 (S.Ct. Onondago County 1932).

Finally, plaintiffs suggest that because LAC was contractually obligated to indemnify Laidlaw-Coggeshall, the latter implicitly assumed the liabilities of LAC's former customers. It has been repeatedly held, however, that such indemnification clauses in and of themselves do not give rise to liability. See, e. g., *Lo Pata v. Bemis Co.,* 383 F.Supp. 342 (E.D.Pa.1974); *Shane v. Hobam,* 332 F.Supp. 526 (E.D.Pa. 1971); *Bankers Trust Co. v. H. Hentz & Co.,* 82 Misc. 873, 372 N.Y.S.2d 797 (S.Ct.1975). In fact, the indemnification clause "is indicative of the opposite." *Bankers Trust, supra,* citing *Lo Pata v. Bemis et al., supra.* In *Shane v. Hobam, supra,* the district court interpreted such an indemnification agreement to "leave no doubt that [the seller] is to bear ultimate responsibility for any product liability claim assessed against [the buyer for] equipment manufactured and sold by [the seller] prior to [the acquisition date]." *Id.* at 528.

granted with respect to its activities following the acquisition of LAC's assets.

It is so ordered.