Staunton.

Roberts Coal Company, Inc., et als.

v.

Corder Coal Company.

September 17, 1925.

1. Improvements—*Right to Compensation.*—Only where the person who puts permanent improvements on the land of another is under the *bona fide* belief that he has good title to the land is he entitled to compensation for such improvements as against the owner of the land.

2. Landlord and Tanant—*Improvements—Right of Lessee to Compensation—Mining Lease—Case at Bar.*—In the absence of any agreement between the parties, there is no obligation on the part of the lessor to pay the lessee for improvements erected by the latter upon the demised premises, though the improvements are such that by reason of their annexation to the freehold they become a part of the realty and cannot be removed by the lessee. In the instant case the tenant in a mining lease knew that its title was limited to a term of ten years, and therefore was not entitled to set off the value of permanent improvements made by it to houses on the leased property against damages for failure to keep the same in reasonably good repair.

3. Words and Phrases—*"Usual."*—The word "usual" is defined as "such as occurs in ordinary practice, or in the ordinary course of events; customary; ordinary; frequent."

4. Landlord and Tenant—*"Usual Wear and Tear"—Mining Lease.*—The words "usual wear and tear," as used in a clause in a mining lease requiring the lessee to keep the houses, machinery and appliances in good reasonable repair and return them to the lessor in good repair, except the usual wear and tear, should be construed with reference to the subject matter and purpose of the lease; and so construed they cover deterioration resulting from all causes usual in a mining industry of the size and character of the mine in question.

5. Landlord and Tenant—*Mining Lease—Usual Wear and Tear—Deterioration from Natural Causes—Words and Phrases—"Natural"—"Usual"—Case at Bar.*—The word "natural" is not synonymous with "usual," and the former cannot be substituted for the latter in a lease. Thus, where a mining lease required the lessee to keep the houses, machinery and appliances in good reasonable repair, and

return them back to the lessor at the expiration of the lease in good repair, except the usual wear and tear, it was not error to refuse an instruction that "usual wear and tear" excepted meant that lessee could be excused from the duty of returning the property in good repair, only to the extent that it had deteriorated from natural causes and from reasonable and proper use thereof in the conduct of the operation.

6. Landlord and Tenant—*Mining Lease—Usual Wear and Tear—Instructions—Case at Bar.*—In the instant case, where a mining lease required the lessee to keep the houses, machinery and appliances in good reasonable repair, and return them back to the lessor at the expiration of the lease in good repair, except the usual wear and tear, instructions which told the jury that it was the lessee's duty under the contract to return the property in good repair, "usual wear and tear excepted," and left the meaning of these words to the jury, in the light of the evidence, were not erroneous, where the issue as to the meaning of "usual wear and tear" arose out of the condition of the mine cars, and the evidence showed that the greater portion of the damage to cars was due to wrecking or violent means; and it further appeared from the evidence that in the mining industry in that section it was usual for mine cars to be subjected to rough treatment, and that it was usual for accidents such as wrecks and falling slate to cause injury to the cars, especially in small mines like the one covered by the lease.

7. Landlord and Tenant—*Mining Lease—Lease and Sublease—Workmanlike and Proper Manner—Practical Construction—Case at Bar.*—In the instant case the lessee of a mine subleased it. The original lease required the lessee to "work and mine the coal in the most effectual, workmanlike, and proper manner," which was the same language used in the sublease. This being true, it was manifestly proper that the jury should consider the practical construction that the lessee had placed upon this clause in arriving at the intention of the parties to the sublease. An instruction, therefore, that the jury, in considering whether the sublessee worked and mined the coal in the most effectual, workmanlike, and proper manner, should take into consideration the plan or method upon which the mine had been opened and worked by the lessee at the time the lease to the sublessee was made, was proper.

8. Landlord and Tenant—*Mining Lease—Lease and Sublease—Workmanlike and Proper Manner—Case at Bar.*—In deciding what was meant by the clause "most effectual, workmanlike, and proper manner" in a sublease of a mine, it was not error to permit the jury to consider the practices and methods not only of the lessee under a like provision in its lease, but also the usual and customary practices and methods of operating other mines of practically the same size and character in the coal fields where the mine was situated.

9. LANDLORD AND TENANT—*Mining Lease—Sublease—Action by Sublessee Against Lessee—Set-Off of Damages for Failure to Keep Water Pumped Out of the Mine—Case at Bar.*—In the instant case, an action by a sublessee of a mine against the lessee, the sublease required the sublessee to keep the water pumped out of the mine and to keep the improvements on the premises in good repair at all times during the continuance of the lease. It was the duty of the sublessee to return the mine in condition for immediate operation, and it appeared that the mine was not in such condition on its return to the lessee.

   *Held:* That it was error to exclude evidence offered by the lessee to show the cost incurred by it in keeping water pumped out of the mine from the time of the surrender of the sublease until the mine could be put in condition for further operations.

10. LANDLORD AND TENANT—*Mining Lease—Sublease—Parol Evidence.*—A lease of a mine required that the lessee should drive the regular size gangways and airways whenever practicable, but a sublease made by the lessee did not contain this provision, and therefore the sublessee was not bound thereby.

   *Held:* That under these circumstances evidence of a parol agreement between the parties to the sublease, to the effect that the sublessee should not be required to advance the main headings of the mine on account of the dirt, was not within the parol evidence rule and was admissible.

11. APPEAL AND ERROR—*Instructions—Invited Error.*—A party cannot invite the court to commit error by asking for an erroneous instruction, and be permitted afterwards to have the verdict set aside for the error into which the court has been misled.

12. APPEAL AND ERROR—*Refusal of New Trial—Judgment by Appellate Court.*—Where the trial court erred in construing a mining lease only in two respects: First, in allowing the lessee to offset the damages for failure to repair with the sum expended by it for permanent improvements, amounting to $203.90; and second, in excluding evidence that the lessor spent $199.15 pumping water out of the mine to put it in condition for operation, the facts before the Supreme Court of Appeals being such as to enable the court to attain the ends of justice, it refused to grant a new trial, and corrected the error mentioned by reversing the judgment for the lessee as to $403.05, and affirming the same as to the residue thereof.

Error to a judgment of the Circuit Court of Wise county, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendants assign error.

*Reversed in part; affirmed in part.*

The opinion states the case.

*C. R. McCorkle* and *E. M. Fulton*, for the plaintiffs in error.

*O. M. Vicars* and *R. P. Bruce*, for the defendant in error.

WEST, J., delivered the opinion of the court.

A. L. P. Corder, H. M. Bandy and C. B. Waring, partners, doing business under the firm name of Corder Coal Company, sued Roberts Coal Company, Incorporated, W. H. Roberts and R. R. Roberts, and recovered a judgment for the sum of $1,580.15, which is now before us for review.

The parties will be referred to as plaintiffs and defendants, with respect to their positions in the lower court.

The following is a brief summary of the uncontroverted facts, substantially in the language set forth in the petition:

W. H. Roberts owned two adjoining tracts of coal lands in Wise county, containing together 785 acres. Roberts Coal Company, Incorporated, was organized for the purpose of mining the coal under this land. The principal stockholders of the company were W. H. Roberts, Mary L. Roberts, his wife, R. R. Roberts, his son, and W. F. Roberts.

On July 1, 1917, W. H. Roberts and wife entered into a written contract with Roberts Coal Company, Inc., by which they leased to the company these coal lands, upon certain terms and conditions set forth in the contract, the most important of which, bearing on the issues here involved, are those contained in sections

10 and 12. Section 10 provides that "the lessee shall work and mine the coal in the most effectual, workmanlike and proper manner * * * " and section 12 provides that "whenever practicable the lessee shall drive the regular size gangways and airways through such portions of such beds or veins of coal as may prove faulty, or may not yield merchantable coal * * * ." The Roberts Coal Company proceeded at once to construct a coal operating plant, including houses and other structures and improvements, and the necessary machinery and equipment. In the meantime the Roberts Coal Company had secured from Vicars and Kelly a lease on a fifteen acre tract of land adjoining the Roberts property, and the drift mouth of the mine and the larger portion of the buildings and outside improvements were located on this fifteen acre tract.

The Roberts company operated the mine until June, 1919, at which time it was shut down by them, on account of the condition of the coal markets. At that time the main entry and air course had been projected diagonally through the boundary from the southwestern corner to a point near the northeastern corner and had been driven in to a distance of about 1,000 feet; first right entry and air course had been turned off and driven for some distance and the point had been reached at which second right entry and air course were to be turned off.

On February 2, 1920, Roberts Coal Company leased to Corder Coal Company its coal and coal mining rights and all buildings, improvements and equipment which it had placed on the property. The provisions of this agreement most pertinent to the issues here involved are found in sections 8. 13 and 14, as follows:

"Eight: The lessee shall work and mine the coal in the most effectual, workmanlike and proper manner * * * ."

"Thirteen: It is further agreed that the lessee shall keep the water pumped out of said mine, and keep the improvements on said premises in good repair at all times during the continuance of this lease."

"Fourteen: It is further agreed in addition to the land mentioned in said lease that the lessor leases to the lessee during the period of this lease all houses, machinery and equipment of every kind that is now on said premises, which is to be inventoried by the lessor and lessee, the inventory showing the value of each house, machinery and equipment which the said lessee is to have free right to use for the purpose of mining and manufacturing of said coal during the life of this lease, the said lessee is to keep said houses, machinery and appliances in good reasonable repair and turn them all back to their lessors at the expiration of this lease in good repair except the usual wear and tear of said machinery and houses."

The Corder Company operated the mine in accordance with the provisions of this agreement until September 2, 1921, on which date a supplemental agreement was entered into between the Roberts Coal Company and the Corder Coal Company, by which certain modifications were made in the lease agreements of July 1, 1917, and February 2, 1920.

The modifications made in the provisions of the prior agreements are covered by clauses 5 and 6, clause 5 releasing the minimum royalty required by the Roberts lease of July 1, 1917, until February 1, 1925, and clause 6 abrogating and annulling clauses 9 and 10 of the agreement of February 2, 1920.

Clause 7 recognizes as binding, and continues in

force, as to the parties to said leases, all other provisions, covenants and stipulations of the prior lease agreements of July 1, 1917, and February 2, 1920. Pursuant to the supplemental agreement of September 2, 1921, the Corder Company advanced to the Roberts Company $2,500 in cash, for which the Roberts Company executed its note to the Corder Company. The Corder Company also advanced a further sum and took from the Roberts Company another note for $1,500.

After giving the notice required by the contract, the Corder Company finally surrendered the lease on November 24, 1923. The Roberts Company accepted the surrender under protest, claiming the mine was not in reasonable repair and not in such condition that it could be operated; that the houses, machinery and equipment were not in reasonable repair, nor in condition to be used, and that portions of the machinery and equipment had been destroyed or removed from the premises.

The Corder Company brought suit on the two notes above mentioned, which had been personally endorsed by W. H. Roberts and R. R. Roberts. Roberts Coal Company filed its special plea of set-off, alleging damages on account of such failure to repair, and including some items for insurance money collected and royalties for which Roberts Coal Company was entitled to credit. The Corder Company filed its grounds of defense to the claim asserted in the special plea of set-off, denying all liability on account of the alleged failure to repair, and setting up a counter claim for certain alleged permanent improvements and additions made to the houses, machinery, etc., as a set-off against any such damage resulting from its alleged failure to repair the same. The trial resulted in a judgment for the plaintiff, as above stated.

The defendants assign as error the action of the court in instructing the jury to allow the plaintiffs the value of the permanent improvements made by it to the buildings as a set-off against any damages resulting from plaintiffs' failure to keep the buildings in good repair.

Instruction No. 1, given by the court, reads in part as follows: "* * * And the jury is further told that in considering the alleged damages to the houses on the said leased premises on account of the alleged failure of the plaintiffs to keep the same in reasonably good repair, they should deduct from such damages, if they should believe any such damages were sustained, the value of any and all permanent improvements to the said houses made by the plaintiffs, if they believe from a preponderance of the evidence any such permanent improvements were made to the said houses by the plaintiffs."

[1] Only where the person who puts permanent improvements on the land of another under the *bona fide* belief that he has good title to the land is he entitled to compensation for such improvements as against the owner of the land.

In *Wright* v. *Johnson*, 108 Va. 855, 62 S. E. 948, the court held that the defendant could not recover for improvements because he had put them on the land knowing that he only had a life estate therein.

In *Effinger* v. *Hall*, 81 Va. 94, it was held that persons who occupy lands under defective titles and make thereon permanent and beneficial improvements, with notice, actual or constructive, of the infirmity of their titles, cannot, upon the recovery of the lands by the rightful owners, obtain compensation for such improvements.

[2] In the instant case the tenant knew that its title was limited to a term of ten years.

In 16 R. C. L., p. 794, the law is stated thus: "In the absence of any agreement between the parties, there is no obligation on the part of the lessor to pay the lessee for improvements erected by the latter upon the demised premises, though the improvements are such that by reason of their annexation to the freehold they become a part of the realty and cannot be removed by the lessee.

The Corder Company relies on *Bodkin* v. *Arnold*, 48 W. Va. 108, 35 S. E. 980, for its right to offset damages for failure to repair with the amount expended for permanent improvement. In so far as that case held that the tenant is entitled to credit for permanent improvements, it is at variance with the Virginia authorities, *supra*, and we cannot follow it.

The clause of the instruction quoted, *supra*, ought not to have been given.

The next assignment of error is the refusal of the court to give instruction "A" offered by the defendants, and the giving of instructions 1 and 2 offered by the plaintiffs.

These instructions involve the extent of the plaintiffs' duty and liability, under clause fourteen of the lease, "to keep the houses, machinery and appliances in good reasonable repair and return them back to the said lessor at the expiration of this lease in good repair, except the *usual wear and tear* of said machinery and houses."

Instructions 1 and 2 told the jury that it was the lessee's duty under the contract to return the property in good repair, "usual wear and tear excepted," and left the meaning of these words to the jury, in the light of the evidence.

Instruction A, if given, would have instructed the

jury that "usual wear and tear" excepted meant that lessee could be excused from the duty of returning the property in good repair, only to the extent that it had deteriorated from natural causes and from reasonable and proper use thereof in the conduct of the operation.

The issue as to the meaning of "usual wear and tear" arises out of the condition of the mine cars. The estimated cost to place them in repair was from $107 to $536.98. The evidence shows that the greater portion of the damages to cars was due to wrecking, or violent means. It further appears from the evidence that in the mining industry in this section it was usual for mine cars to be subjected to rough treatment; that it was usual for accidents such as wrecks and falling slate to cause injury to mine cars, especially in small mines, like the one covered by this lease.

[3] The word "usual" is defined by Mr. Webster as "such as occurs in ordinary practice, or in the ordinary course of events; customary; ordinary; frequent."

[4] The words "usual wear and tear" should be construed with reference to the subject matter and purpose of the lease; and so construed they cover deterioration resulting from all causes usual in a mining industry of the size and character of the mine in question.

[5] The word "natural" is not synonymous with "usual," and the former cannot be substituted for the latter in the lease.

[6] Instructions 1 and 2 correctly stated the law as applied to the evidence in this case and this assignment is without merit.

The third assignment of error is the action of the court in giving plaintiffs' instruction No. 3, and in refusing to give defendants' instruction "B."

Instruction 3 reads as follows: "The court further instructs the jury that the defendant, Roberts Coal Company, had opened up the mine upon the leased premises and had been working and operating the same for some time prior to the lease by it to the plaintiffs, and that the jury in considering whether the plaintiffs worked and mined the coal on the leased premises in the most effectual, workmanlike and proper manner, they should take into consideration the plan or method upon which the said mine had been opened and was being worked and mined by the Roberts Coal Company at the time the said lease to the plaintiffs was made, the extent of the mine development on the leased premises at the time said lease was made, the character of the vein of coal on the leased premises which was to be mined by the plaintiffs, the location of the leased premises, the usual and customary methods employed throughout this coal field, by mines of the class and kind of this mine as shown by the evidence, and all the other evidence offered in this case, and if, under all of the facts and circumstances shown by the evidence, they come to the conclusion that said coal was so mined by the plaintiffs, then they cannot allow defendants any offset on account of the alleged failure of the plaintiffs to work or mine said coal in the most effectual, workmanlike and proper manner."

Instruction "B" reads as follows: "The court instructs the jury that under the terms of the lease it was the duty of the Corder Coal Company to work and mine the coal in the most effectual and workmanlike manner, and this duty cannot be varied or changed by any consideration of any evidence of a tendency or even usage or custom of wagon mines, or other mines in Southwest Virginia, or elsewhere, not to operate coal mines in the most effectual and workmanlike

manner, and any evidence of any such tendency, custom or usage, not to so operate and conduct coal mines, must be wholly disregarded by the jury in their deliberations, and if the jury shall believe from the evidence that the Corder Coal Company did not work and mine said coal in such most effectual and workmanlike manner, then they shall assess such damages, if any, in favor of the defendants as they shall deem reasonable and just arising from such failure, but not to exceed the amount claimed in the plea of offset."

[7] The tenth clause of the lease *to* Roberts Coal Company required that "the lessee shall work and mine the coal in the most effectual, workmanlike and proper manner;" which is the same language used in the eighth clause of the lease *from* Roberts Coal Company *to* Corder Coal Company. This being true, it was manifestly proper that the jury consider the practical construction which the Roberts Coal Company had placed upon this clause, in arriving at the intention of the parties when the eighth clause was written into the lease *to* the Corder Company.

[8] In deciding what was meant by the clause, "most effectual, workmanlike and proper manner," it was not error to permit the jury to consider the practices and methods not only of the Roberts Coal Company under the same contract, but also the usual and customary practices and methods of operating other mines of practically the same size and character in the coal fields of Wise county.

This assignment is likewise without merit.

[9] The fourth assignment of error is the action of the court in excluding evidence offered by the defendants to show the cost incurred by defendants in keeping water pumped out of the mine from the time of the surrender of the lease by plaintiffs until the mine

could be put in condition for further operations to be resumed.

The evidence tends to show that the mine was not in such condition that operations could be resumed at the time the lease was surrendered. Inasmuch as the contract required lessee to "keep the water pumped out of said mine and keep the improvements on said premises in good repair at all times during the continuance of this lease," it was the duty of the plaintiffs to return the mine in condition for immediate operation.

It appears that the mine was not in such condition, and the evidence excluded would have shown that the amount expended by Roberts Coal Company in pumping the water out, so as to put the mine in good condition for operation, was $199.15.

This evidence was improperly excluded.

[10] The fifth assignment of error is based upon the action of the court in refusing to exclude the testimony of A. L. P. Corder relating to an alleged parol agreement between the parties, entered into just before the written lease of February 2, 1920, was executed, to the effect that the Corder Company would not be required to advance the main headings of the mine. The testimony complained of is as follows:

"Q. Now, at the time you were negotiating with the Roberts Coal Company, what, if anything, was said about extending what has been referred to in the evidence as the main entry?

"A. Well, I told him that the main entry, of course the dirt was so large that I couldn't work that and if they meant to require me to work that main entry that I wouldn't consider the lease, but if it was all right for me to work down in the territory where the coal looked best, I would consider the lease.

"Q. What did they say about that?

"A. They agreed that that would be all right.

"Q. Now, you say that before you entered into the contract you told the Roberts Coal Company that you wouldn't consider the contract if you had to drive the main headings; is that correct?

"A. That is correct, yes, sir.    *    *    ."

The Roberts Coal Company contends this evidence tends to vary and contradict the terms and provisions of the written agreement between the parties. They overlook the fact that clause "twelve" in the lease from W. H. Roberts and wife to Roberts Coal Company, requiring the lessee "whenever practicable to drive the regular size gangways and airways, etc.," is omitted from the lease *to* the Corder Coal Company.

Clause "twelve" in the lease *to* Roberts Coal Company reads as follows: "Whenever practicable the lessee shall drive the regular size gangways and airways through such portion of said beds or veins of coal as may prove faulty or may not yield merchantable coal, and shall leave no more coal in the mine opening or working than in the opinion of the engineer of the lessors may be necessary and proper for the full security of the mines, and shall leave pillars and supports along the sides of the gangways and elsewhere as the engineer of the lessors shall consider necessary for such security. Any disagreement arising under this clause shall be settled by arbitration in the manner hereinafter provided for."

Finding that clause "twelve" is not a part of the Corder Coal Company's contract, the defendants contend that paragraph "seven" of the supplemental agreement of September 2, 1921, has the effect of binding the Corder Company by the "twelfth" paragraph of the lease from W. H. Roberts and wife to Roberts Coal Company, *supra.*

Paragraph "seven" of the supplemental agreement reads as follows:

"7. All other provisions, covenants and stipulations of said lease agreement of July 1, 1917, and February 2, 1920, except so far as modified by said supplemental agreement, are continued in full force and effect, and shall continue binding upon the *parties thereto*." (Italics ours.)

The supplemental agreement in no way binds the Corder Company to fulfill and perform the covenants and stipulations contained in the agreement of July 1, 1917, except so far as modified by said supplemental agreement, since the Corder Company is not a party "*thereto*" (the agreement of July 1, 1917).

Roberts Coal Company abandoned the main entry and air course in September, 1918, because the physical conditions made it impracticable to mine the coal and the evidence shows that if the Corder Coal Company undertook to extend the main entry in the direction in which it was being driven, they would "never get out of the dirt."

The parol evidence rule invoked by the defendants has no application here and this assignment is without merit.

[11] The sixth assignment of error is the refusal of the court to give instruction No. 2, offered by the defendants, and in amending it and giving it as amended.

This instruction, with the court's amendment thereto in italics, reads as follows: "The court instructs the jury that under the twelfth clause of the lease of July 1, 1917, which, by the supplemental agreement of September 22, 1921, is recognized as binding and continued in force, it is the duty of the lessee, *whenever practical*, to drive the regular size gangways and airways through any portions of the beds or veins of

coal as might prove faulty or might not yield merchantable coal; and if the jury shall believe, under the evidence, that it was practical, in the proper development of the coal, to *drive the main heading in question*, or any other gangways and airways through such faulty coal, it became the duty of the lessee to do so, and if the jury shall believe from the evidence that the lessee failed to do so, the defendants are entitled to recover of the plaintiffs any damage which the jury shall deem just and proper, under the evidence, not exceeding $5,000 on this account, arising from such failure, *unless they believe from a preponderance of the evidence the plaintiffs were not to work said main heading.*"

This instruction erroneously tells the jury that "under the twelfth clause of the lease of July 1, 1917, which by the supplemental agreement of September 22, 1921, is recognized as binding and continued in force, it is the duty of the lessee, whenever practical, to drive the regular size gangways and airways through any portion of the beds or veins of coal as might prove faulty or might not yield merchantable coal."

As shown, *supra*, the Corder Coal Company is not bound by the twelfth clause of the agreement of July 1, 1917. The defendants invited the court into error and cannot take advantage of their own mistake.

"A party cannot invite the court to commit error by asking for an erroneous instruction and be permitted afterwards to have the verdict set aside for the error into which the court has been misled." *Richmond Traction Co.* v. *Hildebrand*, 99 Va. 52, 34 S. E. 889; *Kimball & Fink* v. *Friend*, 95 Va. 125, 27 S. E. 901.

This assignment is likewise without merit.

The seventh and last assignment of error is the court's refusal to set aside the verdict of the jury and grant the defendants a new trial on the ground that the verdict is contrary to the law and the evidence.

[12] As appears, *supra*, the court erred in only two respects: (a) In allowing the jury, under instruction No. 1, to offset the damages for failure to repair the houses with the sum expended for permanent improvements, amounting to $203.90; and (b) in excluding the evidence that the defendants spent $199.15 pumping water out of the mine to put the same in condition for operation.

The facts before us being such as to enable the court to attain the ends of justice, we refuse to grant a new trial, but will correct the errors by reversing the judgment as to $403.05, and will affirm the same as to the residue thereof.

*Reversed in part; affirmed in part.*