**R–T LEASING CORPORATION,**
**Plaintiff,**

v.

**ETHYL CORPORATION, Defendant.**

**No. 79 Civ. 1720 (CBM).**

United States District Court,
S. D. New York.

Feb. 7, 1980.

Easton & Echtman, P. C. by Irwin M. Echtman, Mark D. Mermel, New York City, for plaintiff.

Cahill Gordon & Reindel by Denis McInerney, P. Kevin Castel, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

Ethyl Corporation (Ethyl) has moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure to dismiss the complaint of R–T Leasing Corporation (R–T Leasing) on the ground that R–T Leasing has failed to establish the existence of genuine issues of material fact ripe for disposition at a plenary trial on the merits. This motion arises from an action lodged against Ethyl, the lessee of railroad tank and hopper cars, by R–T Leasing, the lessor, for two purported breaches of leases executed, respectively, in 1967 and 1968. More specifically, R–T Leasing has alleged that Ethyl's failure to forward inventories of the tank and hopper cars within the thirty-day curative period as provided in the lease as

well as the inadequacy of the inventories belatedly received each constitutes breaches of the leases. Second, R–T Leasing has alleged that Ethyl's use of the railroad cars to transport a lead-based substance, referred to as "motor-fuel antiknock compound" (MFAC), violated Ethyl's duty under section 7 of the lease to maintain the railroad cars in "good working order, condition and repair, reasonable wear and tear excepted."

In addition, R–T Leasing has brought a claim based on Ethyl's alleged wrongful detention of the railroad cars and, finally, has requested declaratory relief.

■ The parties have agreed, pursuant to section 15.5 of the lease, that the terms of the lease were to be construed according to Virginia law. Contracting parties may stipulate controlling law as long as the contract bears a reasonable relationship to the state whose law is stipulated. *Sears, Roebuck & Co. v. Enco Assocs.*, 83 Misc.2d 552, 370 N.Y.S.2d 338 (1975), *aff'd*, 54 App.Div.2d 13, 385 N.Y.S.2d 613 (1976), *modified*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977); *cf. Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court must apply conflicts of law rules of the state in which it sits; thus New York conflicts law applies in this action). As the lease bears a reasonable relationship with Virginia, Virginia law governs the construction of the lease.

As a preliminary observation to a discussion of the merits of this motion for summary judgment, the court notes the absence of a 9(g) statement, detailing the material facts in dispute as required by the local rules of this court, among the affidavit S and supporting memoranda submitted by R–T Leasing in opposition to this motion. This unexplained oversight alone may furnish a ground for a decision in favor of Ethyl. *See Securities Exchange Commission v. Research Automation Corp.*, 585 F.2d 31 (2d Cir. 1978). However, now that the court has considered the facts presented both in the affidavits of the parties and at oral argument, the court has chosen to overlook R–T Leasing's failure to conform to the procedural niceties so important to the expeditious disposition of a motion for summary judgment. Instead, the court has decided to grant Ethyl's motion on the grounds that: 1) R–T Leasing has neglected to comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure in its failure to present, in its affidavit, specific facts that establish the existence of genuine issues of material fact with respect to Ethyl's allegedly unauthorized transport of MFAC and 2) R–T Leasing has not disputed any of the factual issues raised by Ethyl relevant to the timeliness and sufficiency of the inventories.

More punctiliously, the court has sifted through the ninety-three paragraphs in the affidavit submitted by R–T Leasing and has failed to unearth any factual allegations challenging Ethyl's statement of the material factual issues in this action. At best, R–T Leasing disputes facts that are in no way material or even relevant to the resolution of the factual and legal issues extant in this action. Far from stating material facts that challenge Ethyl's version of the underlying facts, R–T Leasing offers for the scrutiny of this court a congerie of unsupported legal conclusions and immaterial facts, leading this court to conclude that no genuine factual issues remain in this action that deserve resolution at a subsequent trial on the merits.

*FACTS*

The events leading to the initiation of R–T Leasing's suit against Ethyl and Ethyl's subsequent motion for summary judgment are described as follows:

In 1967, Ethyl placed orders with two manufacturers for railroad tank and hopper cars. Ownership of these cars was to vest in an unspecified third party. After placing these orders, Ethyl contacted North American Leasing Company (North American) to inquire about the possibility of North American's purchase of the railroad cars. According to Ethyl's proposal, after a purchase, the railroad cars were to be leased to Ethyl.

Mr. Lincoln Stevenson, the president of North American at that time, ultimately agreed to purchase and then to lease the railroad cars to Ethyl. The parties entered into the first lease of the railroad tank and hopper cars on March 15, 1967. The term of the 1967 lease commenced on July 15, 1967 to terminate on July 15, 1982. The second lease, covering the same subject matter, was executed on May 20, 1968; its term commenced on July 15, 1968 to terminate on July 15, 1983. The railroad tank cars were placed into service almost immediately after the commencement of the terms of each lease.

In May, 1970, North American changed its corporate name to R–T Leasing Corporation and operations continued as before until November 13, 1978. It is undisputed that North American and R–T Leasing are identical corporate entities notwithstanding the name change. On this date, the president of R–T Leasing, Mr. Peter Starr, sent a letter to Mr. Bruce Gottwald, a representative of Ethyl, informing Ethyl of its default in its duty to forward inventories of the tank and hopper cars as required by section 15.1 of the 1967 (and 1968) leases.

At a later time, Mr. John Donohue, then the president of R–T Systems, the parent of R–T Leasing, notified Mr. Gottwald in a letter dated December 22, 1978, that Ethyl was still in default of its obligations under the lease. Soon thereafter, on January 26, 1979, Mr. Donohue, by letter, informed Ethyl that 1) R–T Leasing's recent discovery of Ethyl's use of the railroad cars to transport lead-based compounds, MFAC, constituted a clear violation of section 7 of the lease and 2) Ethyl's recently mailed inventories failed to cure its default as their format, too vague to enable R–T Leasing's inspection of the cars, did not comply with the format envisioned in section 15.1 of the lease. Mr. Donohue then stated that R–T Systems had elected to terminate Ethyl's right of possession of the cars pursuant to section 12.1(i) of the lease and directed that Ethyl deliver possession of the railroad cars.

Ethyl's refusal to surrender possession of the tank and hopper cars marked the genesis of the complaint.

## DISCUSSION

### Timeliness of the Inventories

■ Although R–T Leasing alleges in its complaint that Ethyl failed to forward the inventories within the requisite thirty-day curative period as set forth in the lease, R–T Leasing, in its opposing papers, has not challenged Ethyl's contention that the inventories were forwarded in a timely manner. The court, therefore, deems the following facts undisputed.

Ethyl forwarded the requested inventories in an envelope postmarked November 17, 1978, which was then returned as unclaimed by the Post Office on December 4, 1978. Ethyl proceeded to re-mail the inventories on December 5, 1978, pursuant to the instructions of R–T Systems. These inventories reached R–T Leasing well within the thirty-day curative period as set forth in section 12.1(b) of the lease.

In the event that:

(b) The Lessee shall default in the observance or performance of any other covenant, condition or agreement required to be observed or performed by the Lessee hereunder and such default shall continue for more than 30 days after notice thereof from the Lessor to the Lessee. . . .

It also must be noted that, according to the lease, notice is deemed given when mailed. Section 15.4 provides:

*Notices.* Any notice required or permitted to be given by either party hereto to the other shall be deemed to have been given when deposited in the United States mails. . . .

Given these facts, it seems quite obvious to the court that the inventories reached R–T Leasing well within the permissible time period for a cure of the alleged default. Thus, based on these undisputed facts, the court finds as a matter of law that the receipt of the inventories was timely and did not contravene the provisions of the lease regarding cures of default in obligations under the lease.

*Sufficiency of the Inventories*

Ethyl challenges the allegations in the R–T Leasing complaint with respect to the sufficiency of the inventories on two major grounds. First, Ethyl argues that R–T Leasing's inspection of the railroad cars was in no way dependent on the receipt of inventories, making the inventories submitted sufficient as a matter of law. Second, and in the alternative, Ethyl contends that even if the inventories did not comply with the lease, R–T Leasing's acceptance of the inventories in the years 1974 and 1977 in a format identical to the inventory submitted in 1978 constituted a waiver of any objections to the format of the 1978 inventory as a matter of law.

Countering the allegations of Ethyl, R–T Leasing claims that the receipt of the inventories was for the sole purpose of supplying information to enable it to inspect the railroad cars and argues that the question of the sufficiency of the inventories forwarded in 1978 is a disputed issue of material fact suitable for resolution at trial. In support of its claim, R–T Leasing has submitted for the consideration of this court the affidavit of Mr. Peter Starr, currently a consultant to R–T Leasing.

Mr. Starr has designated several areas of deficiencies in the inventory forwarded to R–T Leasing in 1978. First, he states that the inventory, enclosing a list of the locations of the railroad cars as of November 14, 1978, March 31, 1978 and March 25, 1978, was insufficiently detailed to permit the inspection of the cars. This enumeration, according to Mr. Starr, was inadequate in light of the fact that the locations changed daily, making inspection based on an inventory of locations of cars on past dates impossible. Another deficiency cited was that the inventory noted only the city and state of the locations of the cars, locations too general to permit on-site inspection of the railroad cars. The final alleged deficiency in the inventories was that they failed to have affixed the signatures of the vice-president or president of Ethyl as required by the lease.

In essence, the dispute of Ethyl and R–T Leasing revolves around the legal interpretation of section 15.1 of the lease. Thus, the sole question before this court is whether, under the lease, the inventories were crucial to enable R–T Leasing to conduct inspection of the railroad cars.

Section 15.1 provides in pertinent part: *Inspection and Inventories.* During the continuance of this Lease the Lessor shall have the right at its own cost and expense to inspect the Cars at any reasonable time or times whether on the Lessee's property or elsewhere. The Lessee shall at least once during the month of *March* of every year furnish the Lessor with an accurate inventory of all Cars in service executed by the President or a Vice President of the Lessee showing the location of said Cars at such time to the best knowledge of the Lessee.

█ Questions of contract interpretation are to be decided by the court as a matter of law if the relevant contract provision is unambiguous. Since "[d]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law and are, therefore, appropriate subjects for summary judgment," *Dworman v. Mayor and Board of Alderman of Morristown*, 370 F.Supp. 1056 (D.N.J.1974), it is incumbent upon this court to interpret the precise meaning and scope of section 15.1 of the lease in view of the parties' dispute about its proper construction.

█ Having scrutinized the lease of the railroad cars in its entirety, the court concludes that no nexus exists in section 15.1, unambiguous on its face, between the submission of the inventories and the inspection of the railroad cars.

First, the lease provides that the lessee shall submit to the lessor in March of each year an inventory of the location of each car "at such time to the best knowledge of the Lessee." "At such time" implies strongly that the inventories specify the location of the cars at the time of the inventory—namely, in March and at no other time. On the other hand, according to section 15.1, inspection of the cars may oc-

cur "at any reasonable time." Reading these two lines together, it becomes clear to the court that the phrase "any reasonable time" cannot be interpreted to limit the time of inspection of the cars to "March," the appropriate time for the submission of the inventory. Inspection "at any reasonable time" is not equivalent to inspection only "in March of each year."

Furthermore, as the court has gleaned from the plain language of the lease, the logical purpose of the inventory appears to be related to Ethyl's duty to comply with section 8.1, which provides for use of the railroad cars "solely upon the lines of railroads in the continental United States, Canada and Mexico in the usual interchange of traffic." A list of the cities and states of location of the railroad cars, submitted in the annual inventory pursuant to section 15.1 of the lease, would clearly permit R–T Leasing to discover whether the railroad cars were employed solely on the authorized lines.

R–T Leasing's reliance on section IV of the 1966 lease between North American and Ethyl is misguided and of no legal significance. Section IV provides: "Upon demand Lessee will advise Lessor where each Unit is located and permit Lessor to examine each Unit." R–T Leasing argues that this section illuminates the connection between the inventory requirement and the inspection of the railroad cars.

The court marvels at the temerity of R–T Leasing in its presentation, for the scrutiny of this court, of a disembodied portion of a superannuated lease bearing no visible relation or relevance to the leases at issue in this action. R–T Leasing has not attempted to explain the relationship of the inspection requirement of section IV to the inventory requirement, if any, of the 1966 lease, and that of the 1967 and 1968 leases. As in section 15.1 of the 1967 and 1968 leases, section IV contains no time limitation of R–T Leasing's (or North American's) exercise of its right of inspection. The court thereby considers section IV as irrelevant to its resolution of the meaning of section 15.1 of the 1967 and 1968 leases.

As the court is of the opinion that section 15.1 fails to link submission of inventory with R–T Leasing's right of inspection of the railroad cars, the court finds that the inventories submitted by Ethyl in 1978, as the undisputed facts have established, are in full compliance with the provisions of the leases as a matter of law.

The court now turns to R–T Leasing's final objection to the sufficiency of the inventories. R–T Leasing contends that neither the president nor vice-president of Ethyl signed the inventories as required by section 15.1 of the lease. This contention is similarly infirm.

■ Ethyl has produced uncontroverted proof that the vice-presidents of Ethyl, Mr. Gill and Mr. Armstrong, both signed the transmittal letters accompanying the inventory of 1978. The court glimpses nothing in section 15.1 which may be interpreted to impose upon vice-presidents or presidents of Ethyl a duty to affix their signatures boldly across the face of the inventories. The court fully believes that a signature, or even a timorous scribble of a name, across the face of the transmittal letters sufficiently complies with the requirements of section 15.1 of the leases.

In sum, the question of the sufficiency of the inventories submitted in 1978 by R–T Leasing depends upon the court's choice of one of two opposing interpretations of section 15.1 of the leases. As the parties have posited no factual disputes relevant to the resolution of the issue of this breach, the court has properly resolved only a question of law as to the proper interpretation of section 15.1 of the lease. Since the court has so determined that the purpose of the inventory is not to enable speedy inspection, in March of each year, of the railroad cars, the inventories submitted by Ethyl in 1978 are in full compliance with the lease.

■ Although in no way necessary to the determination of the sufficiency of the inventory, the court also notes that even had the court accepted R–T Leasing's interpretation of section 15.1, the undisputed facts establish that R–T Leasing, through its past

conduct, has waived any proclaimed right to insist upon receipt of inventories in a format to permit inspection of the railroad cars.

Ethyl has submitted affidavits that establish that R–T Leasing never inspected the railroad cars during the entire lease term and also never voiced objections to the format of the inventories received in 1977 and 1974, a format identical to those of 1978. Mr. Grant Arnold, General Traffic Manager of Ethyl, employed at Ethyl since 1969 where he supervised the location of the railroad cars, stated, in an affidavit, that he had prepared the inventories forwarded to R–T Leasing in April, 1974 and March, 1977. According to Mr. Arnold, R–T Leasing had voiced no objections to the format of the 1974 and 1977 inventories. Mr. Armstrong, a vice-president responsible for the manufacturing department concurred with Mr. Arnold in his statement, in an affidavit, that R–T Leasing had not objected to the format of the 1974, and 1977 inventories and also had not requested inventories in 1975 and 1976.

Failure to object to these purported breaches, under Virginia law, constitutes a waiver of R–T Leasing's right to object to the sufficiency of the inventory. Deciding against defendants who had objected to deductions in royalty payments after their long-term acquiescence to such deductions, the court in *American Manganese Co. v. Virginia Manganese Co.*, 91 Va. 272, 21 S.E. 466, 467 (1895) stated: "the long-continued acquiescence of the defendant in such [deductions], with full knowledge of all the facts, was a waiver of its rights to insist upon the terms of such contract . . . ." As in *American Manganese*, R–T Leasing has clearly rested upon its alleged rights to object to the format of the inventories and cannot now be heard to object to the format of the 1978 inventory.

*Misuse of the Railroad Cars*

Ethyl contends that the transport of MFAC in the railroad tank cars was fully contemplated at the time of the execution of the leases and, thus, such use was not in violation of section 7 of the lease. In the alternative, Ethyl contends that R–T Leas-

ing has waived its right to object to such use.

According to the version of the facts presented in Ethyl's supporting affidavits, the transport of MFAC in the tank cars was known of and approved by all parties prior and subsequent to the execution of the lease and was well within the knowledge of Mr. Lincoln Stevenson, the president of North American, the predecessor corporation of R–T Leasing.

Ethyl has presented, as evidence, correspondence relevant to the issue of the contemplated use of the railroad cars. Before contacting Mr. Stevenson regarding the possible purchase and ultimate rental of the railroad cars, Ethyl placed two orders to manufacturers expressly requesting cars to transport "motor fuel antiknock compound." Although these orders to a stranger to the leases ultimately executed are in no way dispositive of the issue of the intended use of the railroad tank cars, Ethyl offers further evidence in the form of correspondence between Mr. Stevenson and the representative of Ethyl during the negotiations for the leases of railroad tank and hopper cars. This correspondence referred consistently to "MFAC" leading to an inference that each party knew of and authorized the use of MFAC. Furthermore, Mr. Stevenson, in an affidavit, stated that he knew that the railroad tank cars were to be used to transport MFAC. Finally, the railroad tank cars each contained a marking, "Motor Fuel Antiknock Compound," emblazoned upon the sides of the cars.

Ethyl claims that Mr. Stevenson's actual knowledge of and consent to the use of the railroad tank cars to transport "MFAC," knowledge acquired in his capacity as the president of North American must be imputed to R–T Leasing as a matter of law since North American and R–T Leasing, notwithstanding the name change, are identical corporations.

R–T Leasing has offered several arguments in opposition to this version of the facts, which will be discussed in greater detail below. The common characteristic of

each of these arguments is that each fails to raise specific facts that challenge the version of the facts offered by Ethyl. Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

A party opposing a motion for summary judgment may not rest on mere conclusory statements or general arguments relevant to only legal issues "without supplying supporting arguments or facts in opposition to the motion." *Securities Exchange Commission v. Research Automation Corp., supra* at 33. Rather, the opposing party must supply "concrete particulars" of evidence to place the facts in dispute. *Id. See Donnelly v. Guion*, 467 F.2d 290 (2d Cir. 1972).

All of the points raised by R–T Leasing in opposition to the facts underlying this alleged breach fail to specify "concrete particulars." Thus, the court deems the facts offered by Ethyl undisputed.

First, R–T Leasing claims that Mr. Stevenson, the president of North American who negotiated both leases with Ethyl, is not to be expected to be familiar with the meaning of such arcane technical terms as MFAC. In addition to being a purely legal conclusion outside the scope of a motion for summary judgment, this contention is totally groundless.

R–T Leasing has neglected to offer specific facts to cast into doubt Mr. Stevenson's familiarity with the meaning of MFAC. Furthermore, regardless of Mr. Stevenson's actual knowledge of the intended use of the railroad tank cars and the meaning of MFAC, Stevenson, as a matter of law, is to be held to have constructive notice of the meaning of MFAC.

■ MFAC is a term of trade usage, the definition of which appears in 49 C.F.R.

§ 173.354. MFAC, or "motor fuel anti-knock compound" is defined in section 173.-354 as "a mixture of one or more organic lead compounds—such as tetraethyl lead, triethylmethyl lead, diethyldimenthyl lead . . . ." It is axiomatic that parties who contract or negotiate in reference to terms of trade usage "must be charged with constructive notice thereof. It is well settled that when regulations are published in the Federal Register they give legal notice of their contents to all who may be affected thereby." *Wolfson v. United States*, 492 F.2d 1386, 1392 (Ct.Cl.1974).

■ Mr. Stevenson, in negotiating about the contemplated leases, is surely a party affected by the allegedly contemplated use of MFAC and therefore must be held accountable to constructive notice of MFAC as a lead based compound as defined in the Federal Regulations. As Mr. Stevenson is on notice of the definition of MFAC as a matter of law, no disputed factual issues exist in this respect.

Next, offering various arguments related to the accuracy of Mr. Stevenson's knowledge of the meaning of MFAC, R–T Leasing disclaims any actual knowledge or constructive notice of the use of MFAC, and concludes that factual issues exist as to the knowledge of R–T Leasing with respect to the intended and actual transport of MFAC.

R–T Leasing contends that any knowledge of the intended and actual use of the railroad tank cars acquired by Mr. Stevenson and North American cannot be imputed to R–T Leasing. In support of its claim of ignorance of the transport of MFAC, R–T Leasing claims that no correspondence bearing any reference to MFAC exists in its files despite a "thorough search through hundreds of documents and correspondence produced by Ethyl." (Starr Aff. at ¶ 6).

■ However, the appearance, disappearance or nonappearance of the early correspondence is immaterial to the issue of the knowledge of R–T Leasing with respect to the transport of MFAC. North American and R–T Leasing, as R–T Leasing has admitted in paragraph three of its com-

plaint, are identical corporations. Thus, any knowledge acquired by Mr. Stevenson in his capacity as the president of North American is to be imputed to R–T Leasing as a matter of law, regardless of the actual location of the correspondence referring to MFAC. Again, R–T Leasing has raised only a legal argument concerning the extent of R–T Leasing's knowledge of the transport of MFAC. R–T Leasing has failed to produce evidence, for example, of other correspondence, tending to cast doubt upon Ethyl's claims and supporting evidence that the original contracting parties negotiated in reference to the contemplated transport of MFAC.

Similarly unfounded is R–T Leasing's contention that Mr. Stevenson's credibility is at issue, requiring a resolution of this issue at trial. In essence, R–T Leasing argues that Mr. Stevenson's refusal to prepare an affidavit for R–T Leasing and his subsequent agreement to submit an affidavit for Ethyl conclusively establishes that Stevenson has acquired a stake in the outcome of this action.

The court remains unpersuaded that Mr. Stevenson is an "interested party" in this litigation simply because he declined to swear out an affidavit in support of R–T Leasing. There is neither an issue of good faith requiring an examination of the issue of credibility at a subsequent trial nor an issue as to the motive of the parties in executing the leases. *See United States v. Perry*, 431 F.2d 1020 (9th Cir. 1970).

■ R–T Leasing next contends that Ethyl is attempting to conduct a "trial" by affidavit contrary to the strictures of Rule 56. This contention also fails. Trial by affidavit occurs when a party submits affidavits containing mere opinion instead of specific factual allegations in an action where credibility is at issue. It is in this particular situation that affidavits are no substitute for strident cross-examination. *Redman v. Warrener*, 516 F.2d 766 (1st Cir. 1975); *F. A. R. Liquidating Corp. v. Brownell*, 209 F.2d 375 (3rd Cir. 1954).

In the case at hand, Ethyl has submitted well documented affidavits containing spe-

cific factual allegations. Furthermore, no issues of credibility appear and as a result, this contention must fail.

Finally, R–T Leasing claims that it had no actual knowledge of the transport of MFAC because it was prevented from inspecting the tank cars due to the allegedly inadequate inventories submitted by Ethyl. This lack of actual knowledge, R–T Leasing argues, raises a factual issue as to the existence of the markings, MFAC, affixed to the sides of the tank cars that transported MFAC.

■ As the court has already discussed, actual knowledge of a trade term used by those affected is irrelevant as the parties will be deemed on constructive notice of the meaning and existence of the term as a matter of law. Since R–T Leasing had constructive notice of the markings and does not offer any facts to the effect that the tank cars contained no markings, any absence of actual knowledge is irrelevant.

In sum, since R–T Leasing has not presented to this court a viable challenge to the version of the facts presented by Ethyl, the court accepts the version of facts presented in the affidavits of Ethyl as undisputed, making this motion ripe for summary judgment. *See Lake Havasu Estates, Inc. v. Reader's Digest Assoc.*, 441 F.Supp. 489 (S.D.N.Y.1977); *Capreol v. Cunard Line, Ltd.*, 78 Civ. 6174 (S.D.N.Y. March 28, 1979).

■ The only question remaining for the court to determine is whether Ethyl is entitled to judgment as a matter of law. R–T Leasing claims that Ethyl's transport of MFAC violated section 7 of the lease. Section 7 provides in part:

The Lessee shall during the continuance of this Lease keep the Cars in good working order, condition and repair, reasonable wear and tear excepted. . . .

The issue before the court at this juncture is whether the transport of MFAC constituted maintenance of the tank cars in "good working order . . . reasonable wear and tear excepted . . . ." Under Vir-

ginia law, the words "usual wear and tear" may be interpreted in reference "to the subject-matter and purpose of the lease; and so construed they cover deterioration resulting from all causes [attendant to the particular character of the business in question]." *Roberts Coal Co. v. Corder Coal Co.*, 143 Va. 133, 129 S.E. 341, 344 (1925).

In deciding what the reasonable use of the railroad cars is in the case at hand, the court is fully entitled to consider the evidence of the parties' contemplated use of the cars and is also permitted, contrary to R–T Leasing's contention, to consider parol evidence to clarify and pinpoint what constitutes reasonable use. *Interform Co. v. Mitchell*, 575 F.2d 1270 (9th Cir. 1978); *Skockey v. Westcott*, 189 Va. 381, 53 S.E.2d 17 (1949); *American Crystal Sugar Co. v. Nicholas*, 124 F.2d 477 (10th Cir. 1941).

As the lease fails to specify the particular type of compounds to be transported in the cars, the meaning of "good working order" and "reasonable wear and tear" is placed in doubt, requiring the court to employ extrinsic evidence to clarify the meaning of these clauses. The evidence includes any prior or contemporaneous negotiations or agreement between Stevenson and the Ethyl representative in the circumstances surrounding the execution of the lease.

As the designation of the type of substance to be transported by the tank cars is entirely absent from the lease, "[w]hile it is elementary that parol evidence is not admissible to explain or undertake to qualify a written agreement when it constitutes a complete statement of the bargain, it is equally as elementary that the rule does not apply where the writing on its face is ambiguous, vague or indefinite, or *does not embody the entire agreement.* In such case, parol evidence is always admissible, not to contradict or vary the terms, but to establish the real contract between the parties." *Skockey v. Westcott, supra*, 189 Va. 381, 389, 53 S.E.2d at 20. (Emphasis added).

It is in this context that a determination of the probable intent of R–T Leas-

ing and Ethyl with respect to the substances transported in the railroad tank cars becomes particularly crucial in arriving at the proper construction of "good working order" and "reasonable wear and tear excepted." It is true that issues of intent, as R–T Leasing claims, are essentially factual issues, *see People's Outfitting Co. v. General Electric Credit Corp.*, 549 F.2d 42 (7th Cir. 1977), but it is equally true that the court may decide issues of intent as a matter of law when, as here, the underlying facts are undisputed by the parties. *Tokio Marine & Fire Insurance Co. v. McDonnell Douglas Corp.*, 465 F.Supp. 790 (S.D.N.Y. 1977).

Based on the uncontroverted facts presented in Ethyl's affidavits, it becomes clear that the parties to the leases of the railroad cars contemplated as part of the material purpose of the lease that the railroad tank cars would transport MFAC. Both Mr. Stevenson and the responsible party at Ethyl contracted in reference to this contemplated use of the tank cars to transport MFAC. The correspondence exchanged between the contracting parties bore copious references to MFAC or "motor fuel antiknock compound." After the execution of the 1967 lease, the tank cars were immediately employed to transport MFAC. Furthermore, soon after the commencement of the lease term, Ethyl affixed to the broadsides of each tank car the bold words, as mandated by the federal regulations, "Motor Fuel Antiknock Compound."

Having divined the intent of the parties with respect to the type of substances authorized to be transported by the tank cars, a determination winnowed from the rather acrimonious pleadings of the parties to this motion, the court finds as a matter of law that the use of the tank cars was well within the scope of section 7 of the lease. Any deterioration of the tank cars due to the transport of the lead-based compound was well within the directive that Ethyl should maintain the cars in good condition. Any effect MFAC may have had upon the railroad tank cars may be considered "reasonable wear and tear" under the lease and also according to Virginia law.

■ As for the claims of a need for further discovery and the existence of a new breach of the lease, R–T Leasing has raised two more totally fallible points. Ethyl has fully cooperated with the discovery requests of R–T Leasing. A vague claim of the need for additional discovery, unsupported by any basis in fact, is an insufficient ground upon which to oppose a motion for summary judgment. *See L. Orlik Ltd. v. Helme Products, Inc.,* 427 F.Supp. 771, 778 (S.D.N.Y.1977).

■ R–T Leasing also claims that Ethyl's placement of its own name on the railroad cars constitutes a breach of section 11 of the lease. This contention is also untrue. Section 11 provides "that the Lessee may permit the Cars to be lettered in some appropriate manner for convenience of identification of the interest of Lessee therein. . . ." Obviously, the placement of Ethyl's name on the railroad cars, identifying its interest in the cars, is in full compliance with the lease.

Since R–T Leasing's opposition to this motion is totally without merit and Ethyl is entitled to judgment as a matter of law, the motion for summary judgment is hereby granted.